The Bank of Wilber, *Appellant*, v. J. A. Freeburg, *Appellee*.

No. 16,877.

### SYLLABUS BY THE COURT.

Negotiable Instruments—*Sale and Transfer—Bona Fides—Evidence—Circumstantial—Direct*. Where the circumstances surrounding the transfer of a note, both before and after the transfer, indicate that the transfer was only made for the purpose of enabling the plaintiff, the indorsee, to defeat defenses which might be set up against the note in an action thereon by the payee, a jury and the court in trying the case are justified in finding that there was, in fact, no *bona fide* sale and transfer of the note, although there is evidence of actual payment by the transferee to the holder and that the transferee had no notice of any infirmity or defense against the note. The jury and the court have the right to believe the circumstantial evidence and to disbelieve the direct evidence.

Appeal from Republic district court. Opinion filed March 11, 1911. Affirmed.

*F. W. Bartos, Stanley Bartos,* and *W. D. Vance,* for the appellant.

*Hugh Alexander,* and *Nelson J. Ward,* for the appellee.

The opinion of the court was delivered by

SMITH, J.: This action was brought by the bank to recover a judgment on a note given by the defendant. There was evidence which tended to show that the note arose out of the following transaction: Swanson and Claflin ordered one sixteen-horsepower Huber traction engine of the Huber Manufacturing Company, of Marion, Ohio, through the defendant, the local agent for the Huber company at Scandia, Kan. The order on the part of the company was executed by C. E. Miller, as agent, and by Swanson and Claflin, the purchasers, and contained a contract of warranty that the engine was made of good material, was well constructed, and, with proper management, capable of doing well the work for which the machine was made and sold; that if inside of six days from the date of its first use it should fail in any respect to fill the warranty, written notice should be given to the company at its home office and to the agent, and a reasonable time allowed to get to the machine with skilled workmen and remedy the defects. The engine proved defective, and Swanson and Claflin notified the local agent verbally and he notified the company, and an expert was sent and attempted to make it work. It again failed to work, and again notice was given and an expert came two or three times, but it still failed to work properly, and the purchasers delivered the engine to the local agent, who wrote the company that the engine had been brought in and to send a man, with proper authority, to compromise.

Thereafter Mr. Miller, the agent who signed the contract, came and made the following settlement: The Huber Manufacturing Company was to return forthwith the note in suit to the defendant and take back the engine sold to Swanson and Claflin, and the matter should be fully settled. This agreement was made November 12, 1907.

It also appeared that Swanson and Claflin had given

their three notes to the company, for $500 each, in payment for the engine, and that the company agreed to assign these notes, without recourse, to Freeburg for the note in suit, an old engine and his commission in the transaction; also, that about the time of the settlement of November 12, 1907, C. E. Miller, the agent, called at the Bank of Scandia for the note in suit, and was informed that it had been there, that Freeburg had refused payment, and it had been returned to the company. The note had previously been sent to the Bank of Scandia, indorsed: "For collection, pay to the order of Bank of Scandia, Kan. The Huber Manfg. Co., Marion, Ohio." This bank had immediately presented the note to the defendant, who refused payment, and the bank returned it to the manufacturing company, with the letter that came with the note, with notice that payment had been refused.

The note in suit was due, on its face, December 26, 1907. Sometime before that date the agent, C. E. Miller, was in the plaintiff bank and talked with the cashier, Bartos, about the note before its alleged purchase, which the evidence shows, if made at all, was made by the cashier, who testified in substance that the only investigation he made as to the financial standing of the defendant was that "when Mr. C. E. Miller first mentioned the note I asked him who this Freeburg was, and it was through him that I got the standing of Freeburg." Whether the agent of the company, in arranging the alleged sale to the bank, made any representation as to the responsibility of Freeburg does not appear. It does appear, however, that the proposition was made to sell the note to the bank at a discount of $50. December 16 thereafter E. D. Streeter, manager of the Huber Manufacturing Company, addressed a letter to the Bank of Wilber which reads, in part, as follows:

"Mr. Miller stated you offered to give us $950 for this note. We have decided to let you have the note for

$950. We are inclosing herewith the note properly indorsed. Please send us draft for same by return mail, and oblige."

The plaintiff, by its cashier, Bartos, produced the discount register of the bank at the trial, and, after identifying it, testified:

"Ques. This discount register has a column headed 'Discount'; another column to the right of that, headed 'Amount paid'; and in the first column, against this Freeburg note, is written, in ink, '$50,' while against this Freeburg note, in the other column, it is blank; is not that the fact? Ans. Yes, sir; that is the fact.

"Q. In said discount register there is a column headed 'Drawer or maker,' in which appears the name of J. A. Freeburg, and next to that column is another column, headed 'Drawee or indorser,' and in this last-mentioned column, opposite the name of J. A. Freeburg, it is blank, there being no entry as to the drawee or indorser on the Freeburg note; is not that a fact? A. That is a fact."

A copy of the draft was also introduced in evidence, viz.:

"The Bank of Wilber.        Wilber, Neb. Dec. 18, 1907.
"$950.                                          No. 12,962
"Pay to the order of Huber Manufacturing Co. $950, nine hundred fifty and no-100 dollars. To First National Bank, Lincoln, Neb.    Jos. BARTOS, *Cashier*."
Indorsed:  "Pay to the order of City National Bank for deposit. The Huber Mfg. Co., E. D. Streeter, Mgr. Paid through Lincoln Clearing House, Dec. 20, 1907. City National Bank."

Besides the showing of irregularity in the copy of the bank's register, in that no mention was made of the drawee or indorser, the cashier testified that he had not notified the Huber Manufacturing Company of the nonpayment of the note, and did not know of any notice having been given to it. After he heard from the defendant, soon after the alleged purchase of the note, he immediately turned the note over to the attorneys of the plaintiff for collection, who immediately brought this suit. Both the cashier, Bartos, and the manager

of the Huber Manufacturing Company testified that they knew of no infirmity in the note or any defense thereto at the time of the alleged sale thereof, but the manager said that he got the letter from the Bank of Scandia, with the indorsement that payment had been refused.

After the close of the evidence the court instructed the jury, and refused some instructions requested by the plaintiff, such refusal being assigned as error. The jury retired and returned the following special findings, excepting question No. 11, which the court had correctly instructed was immaterial:

"(1)  Ques.  From whom, if anyone, did the plaintiff purchase the note in question in this action?  Ans. No one.

"(2)  Q.  What did the plaintiff pay for said note, if anything?  A.  Nothing.

"(3)  Q.  To whom was such consideration, if any, paid?  A.  No one.

"(4)  Q.  Was such note purchased prior to maturity —that is, prior to December 26, 1907?  A.  No.

"(5)  Q.  Did the plaintiff bank have any notice that Freeburg was intending to refuse or had refused payment of said note?  A.  Yes.

"(6)  Q.  Did the plaintiff bank have any notice that the note in suit was in payment for the engine testified about in this action?  A.  Yes.

"(7)  Q.  If you answer questions 5 and 6 in the affirmative, then state of what such notice consisted, by whom made, and in what manner.  A.  Stamp on back of note and Miller verbal.

"(8)  Q. Did the indorsement, 'For collection,' constitute notice to the plaintiff of an infirmity in the note in suit?  A.  Yes.

"(9)  Q.  If you answer question 8 in the affirmative, did that constitute the only notice that plaintiff had? A.  No.

"(10)  Q.  Before the maturity of the note in suit did the defendant and Miller, the agent of the Huber Manufacturing Company, make a settlement whereby this note was to be returned to him, and the company get back the engine?  A.  Yes."

It may be conceded that the court erred in its instructions as to what amounted to notice to the bank of an infirmity in the note, and, under all the circumstances, the bank would not be required to make investigation and inquiry if it bought the note in good faith; but the main question is whether or not the plaintiff bank in fact purchased the note in due course of business. Any of the errors which are complained of could not have misled the jury in determining this question. As will be seen by their special findings, the jury did not believe that there was any actual purchase of the note, and the eminent and fair district judge who presided at the trial, in refusing to set aside the findings and verdict, evidently agreed with the findings of the jury. We can not say that the findings are not supported by the evidence; in fact the whole transaction looks like a scheme to enforce payment of the note against the defendant, and to enable the plaintiff bank, instead of the Huber Manufacturing Company, to bring an action thereon for the benefit of the Huber company, for which the bank generally acted as collection agent in the surrounding country. It was a palpable fraud on the part of the agent, C. E. Miller, after he had himself made the settlement and received back the consideration for the note, and on the part of the Huber Manufacturing Company, after it had been notified of his action therein, to attempt to collect the note. In fact the evidence shows that Miller, when he called for the note at the Bank of Scandia, after the settlement, stated that it belonged to Freeburg.

The circumstances under which the bank claims to have bought the unsecured note were probably considered by the jury, as they had the right to consider them. The plaintiff's evidence tended to show: That the sole maker resided in another state, and the bank made no inquiry as to his responsibility, except from the apparently irresponsible agent of the Huber Manufacturing Company, who was promoting the sale, and

from whom no specific information seems to have been obtained; the irregular manner in which the note was entered upon the books of the bank; the small discount of five per cent, being about the commission of a local collector who makes a collection without suit; and all this at a time when it is a matter of general knowledge that the whole country, east and west, was in the throes of a great financial panic, during which depositors in many of the strongest banks could withdraw their money only in driblets to meet the necessities of life. It may be said that there was no evidence of the panic, but juries and courts may take cognizance of such facts as are within the common knowledge of mankind, without formal proof. Again, the conduct of the plaintiff, after the alleged purchase, seems to impeach the good faith of the transaction. It paid no attention to the presumably solvent indorser, not even notifying the Huber company of the nonpayment of the note, but immediately employed attorneys and started this action, when it had other notes belonging to the indorser in its possession for collection. This is not ordinary prudence, nor the ordinary course of business. The entire transaction suggests that some arrangement or guaranty had been made between the Huber Manufacturing Company and the bank that it would be saved from loss, even to costs of suit. Nothing less than this would, under the circumstances, be ordinary business prudence. The transaction, as claimed by the plaintiff, is hardly conceivable as a business proposition.

The judgment is affirmed.