THE STATE OF KANSAS v. CYRUS ALDRICH.

1. HOMICIDE — *Plea in Abatement.* It is not error on the part of the trial court to overrule a plea in abatement, based solely upon the fact that the warrant of arrest directs the officer serving it to bring the prisoner before the magistrate issuing such warrant, instead of directing that he be taken before "some magistrate of the county."

2. DYING DECLARATIONS, *Received in Evidence.* The testimony examined, and *held,* that the court committed no error in receiving in

evidence the declarations of the deceased relative to the manner in which he received the wound from which he died.

3. INSTRUCTIONS — *No Error.* The opening statement of the instructions given by the court reviewed, and *held,* that it contains nothing of which the defendant can complain.

*Appeal from Norton District Court.*

AT the September term, 1891, *Aldrich* was convicted of murder in the second degree. He appeals. The opinion states the facts.

*Louis K. Pratt,* for appellant.

Opinion by STRANG, C.: This was a criminal prosecution, upon an information filed in the district court of Norton county, July 23, 1891, charging the defendant with having, on the 26th day of May, 1891, killed and murdered one Edward Hagaman. Aldrich was tried at the September term, 1891, and convicted of murder in the second degree. A motion for a new trial was overruled, and he was sentenced to serve a period of 10 years, at hard labor, in the penitentiary. From this judgment and sentence he appeals to this court.

Counsel for defendant alleges the following errors on the part of the trial court: (1) The court erred in overruling the plea in abatement; (2) the court erred in the admission and rejection of evidence; (3) error in giving instructions complained of; (4) in overruling motion for new trial. May 4, 1890, the defendant obtained a loan of one Akers, a farmer living near him, of $42, and gave a chattel mortgage upon a team of horses to secure the debt. The horses were to remain in the possession of the defendant, for use by him on his farm, until the condition of the mortgage was broken, when the mortgagee or his agent was to have the right to go upon the defendant's premises and take possession of them. May 26, 1891, the defendant, having defaulted on the mortgage, it was turned over to a justice of the peace for collection; and on that day Hagaman, who was a constable, was

directed to go and get the money or the property. He called on the defendant, who said he could not pay at that time. The defendant and the constable then called on Mrs. Akers, her husband being absent in Missouri, and the defendant asked further time on the debt, which was refused him. The constable then went back to the premises of the defendant to get possession of the horses. The son and daughter of the defendant were with the horses in the field. The defendant also went to where the horses were, and said he would not give them up, and raised his cane and told Hagaman he must not touch them. Hagaman then reached toward one of the horses to take hold of it, when the defendant dropped his cane, drew a revolver from his pocket, and fired at Hagaman. The latter then drew his pistol, and several shots were exchanged, Hagaman being shot through the stomach, which wound proved fatal.

The first contention of the defendant is, that the trial court erred in overruling his plea in abatement. When the case was called for trial, September 21, 1891, the defendant interposed a plea in abatement, alleging that the warrant upon which he was arrested was illegal and void, because it commanded the officer to whom it was directed to take the defendant before the magistrate issuing the same, instead of before "some magistrate of Norton county." We do not think the warrant of arrest in the case is illegal and void for the reason given, which is the only objection thereto. It is not claimed that the defendant objected to going before the magistrate issuing the warrant for a hearing, nor, so far as the record shows, was there any objection by the defendant to submitting to a preliminary examination before such magistrate. And there is no allegation that the defendant did not have a proper examination before a competent magistrate. The sole contention, so far as this plea is concerned, is, that the warrant was void for the reason above mentioned. The warrant was issued upon a complaint properly verified, and was itself in proper form, except that it was in form a special, instead of being a general, warrant. The warrant was

not void, and the defendant having gone before the magistrate issuing it without objection, and there submitted to an examination of which he does not complain, we do not think the court committed error in overruling the plea in abatement. (*The State v. Bailey*, 32 Kas. 83.)

The second contention of the defendant is, that the court erred in permitting the dying declarations of the deceased, Hagaman, detailing the circumstances in connection with his being shot, in evidence.   Before such declarations were permitted to go to the jury, a foundation was laid by the following testimony: Doctor Sprague, who was called to see the deceased soon after he was wounded, says:

"I found him in a critical condition.  I found wounds in two places, one through his hand and one through his body. He was vomiting blood every few minutes.  I tried to stop the blood by giving medicine by way of his stomach.  He wanted to know if he was badly wounded.  I told him that I thought so.  He wanted to know if he was fatally wounded, and I told him I thought he was.  Then he wanted me to keep him alive until his wife got there.  I injected in his arm one-fourth grain of morphia, which acted upon him, and the hemorrhage stopped."

On cross-examination the doctor further stated:

"Ques. In your opinion, that blood came from his stomach?  Ans. Yes, sir.

"Q. Could not the blood come from some other way?  A. He would not vomit it if not hit in the stomach.

"Q. Did n't you always tell him he might get over it?  A. No, sir.

"Q. Did n't you hold out to him any possibility at all of his getting over it?  A. No, sir.

"Q. What did he say about living?  A. He wanted to know of me if there was a possibility for him to get over it. I told him I thought not.  Then he said, 'Well, keep me alive till my wife gets here.'

"Q. Did n't you tell him that he would probably live till his wife got there?  A. Yes.  I told him there was a possible chance for him to live for several days.

"Q. Did he say anything?  A. He thought he was fatally wounded.

"Q. Did you have any further talk with him about his living?  A. No, sir.

"Q. Did he say anything to his wife? A. Yes; he said it was all right whether he lived or died; that he was doing his duty.

"Q. Did he say he thought the wound was fatal? A. I told him, but I don't know whether he thought so or not. I was well of the opinion that it was a fatal wound. I can't pass an opinion for him.

"Q. You told him that you thought it a fatal wound? A. Yes, sir.

"Q. He wanted to know if you thought you could keep him alive till his family got there? A. Yes, sir."

Charles Ewart, another physician, was examined on this question, and testified:

"Ques. State whether or not that wound was fatal. Ans. Yes, sir.

"Q. Do you say that he would necessarily die from it? A. Yes, sir.

"Q. What, if anything, did Hagaman say as to his condition, whether or not the wound was fatal, or he would be liable to get well? A. When I first called, he told me in about these words: He said, 'They got me this time, but they had to double on me.'

"Q. Did he seem to have any hope of recovery? A. He didn't express it so. Afterward he said it was no use in holding up any longer. I knew he was sinking."

On cross-examination he said:

"Ques. What reason did he give for thinking he was fatally hurt? A. Because he was shot through the stomach. He knew he could not get over that.

"Q. Do you know how long he conversed with his wife and boys? A. It might have been five minutes.

"Q. What did he tell them? A. I don't know. I only heard him tell one of the boys that he must take care of his mother. I remember that he told Eddie that."

J. H. Allen was sworn and examined upon this question also, and testified as follows:

"Ques. What he said to you was before Sprague got there? Ans. I think Sprague and me got there about the same time.

"Q. Had Sprague seen him yet? A. I don't think he had.

"Q. Tell what he said about the wounds he received? A.

When I came in he said, 'Allen, I am killed; I have got my death shot. I am bound to die.' He said, 'Do you think my wife will get here?' I told him I thought he would last that long.

"Q. Did you say anything to him about his wounds? A. I told him, 'I believe you are bound to die.'"

H. J. Schelle testified as follows:

"Ques. What did he say about the wound he had received that day? Ans. Why, he said he thought it would cause his death.

"Q. You say he told you that he thought he had to die? A. Yes, sir.

"Q. What did you say to him? A. I told him there was no hope for him.

"Q. Did he express any doubt as to whether he was going to live or die? A. He said he was going to die.

"Q. Did he say anything about any physician? A. He did n't think any of them could save him.

"Q. What did he say about it? A. He thought they were a long time coming.

"Q. Did he say he thought they could help him? A. No, sir."

A review of all this testimony makes it appear very clear to us that Hagaman had no hope of ultimate recovery at the times when he made his several statements relative to the shooting. The utmost he hoped for was to live a short time —long enough to see his family. His interview with his family shows that he had no hope of recovery. After talking a few minutes with his wife and children, he said to his oldest boy, Eddie, "You must take care of your mother." The evidence of Doctor Ewart and that of Mr. Schelle was not before the court when Doctor Sprague was permitted to give the declarations of the deceased concerning the shooting. But the court had received at that time the evidence of Mr. Allen, which was very pointed and conclusive upon the question of the deceased's condition. And we think, taking all the evidence on the subject together, it shows that the deceased had no hope of recovery after he first talked with Doctor Sprague, and with Mr. Allen, who talked with Hagaman about the same time Sprague did, both of whom informed

him that his wound was fatal. The details of the shooting, as given by Hagaman to each of the witnesses, were substantially the same; so that, in legal effect, the foundation for the admission of all of such declarations was supported by the evidence of all the witnesses testifying relative to his condition and frame of mind concerning the same, when such declarations were made. We think the statements of the deceased relative to the shooting, when he received the wound from which he died, were clearly admissible.

Counsel for defendant objects to the opening statement of the court in connection with the instructions. We think, however, the remarks of counsel in his brief on the subject are entirely without excuse. We find nothing in such statement of which either side to the case can rightfully complain.

We see no reason why the defendant did not have a proper trial, and therefore recommend that the judgment of the trial court be affirmed.

By the Court: It is so ordered.

All the Justices concurring.