The State v. Smith.

---

No. 21,732.

THE STATE OF KANSAS, *Appellee*, v. ROBERT E. SMITH, *Appellant*.

SYLLABUS BY THE COURT.

1. HOMICIDE—*Trial—Qualification of Jurors*. Two jurors, after examination by the parties, stated to the court that they knew nothing about the facts of the case and their minds were in such condition that they could sit and try it as properly and impartially as though they had heard nothing about it. The trial court decided that they were free from bias, and overruled challenges for cause. *Held*, that, disqualification or abuse of discretion not appearing, such ruling must be sustained.

2. SAME. One juror stated that he had heard that the deceased made a dying statement, and was asked whether he had an opinion that when making it she believed she would not recover. An objection to this question was sustained. *Held*, that as the question itself was improper, and the juror testified that he was not acquainted with the deceased, knew no reason why he could not be a fair and impartial juror, did not entertain an opinion that she had been assaulted, and did not remember having talked with anybody about the crime, no error was committed in sustaining the objection.

3. SAME—*Reputation of Defendant—Cross-examination of Defendant*. The defendant, having offered the testimony of numerous witnesses as to his reputation for being a peaceable and law-abiding citizen, was asked on cross-examination if he did not state at one time that he was the father of the unborn child of a certain person, to which he replied, "I certainly did not." Another witness was permitted to testify that at the time mentioned he did make such statement. *Held*, that the

The State v. Smith.

state was bound by the answer of the defendant on cross-examination as to this collateral issue, and it was error to admit the rebutting testimony; but, in view of the crime charged, the character testimony, and the remoteness of the statement testified to, the error was not of sufficient importance to constitute material prejudice requiring a reversal.

4. SAME—*Defense of Suicide—Evidence.* One theory of the defense was suicide, and the defendant testified to curses and abuse of the deceased by her husband on the morning before the tragedy. Testimony was received that on the same morning she waved good-bye to the husband, and that on his return that day from his journey there was in his grip a note from her expressing affection and congratulations on his birthday. *Held,* competent and proper.

5. SAME — *Evidence — Screams of Deceased — Cross-examination.* A neighbor who testified that the screams from the deceased seemed to come all from the same place, was asked if on the preliminary examination she had not testified that they did not sound as if they came all from the same place, to which she replied that she did not know what she had said at that time. A question from the preliminary examination was then read, and she was asked if she did not answer as there shown, but an objection to the question was sustained. *Held,* that, while such objection might properly have been overruled, the matter was not of sufficient consequence or materiality to work prejudicial error.

6. SAME—*Evidence of Physician.* A physician who had attended on the deceased different times and treated her, was asked the nature of her ailments at such times, but was not permitted to answer. *Held,* that the defendant cannot complain of not being permitted to prove his theory of suicide by the cross-examination of the state's witness.

7. SAME—*Evidence—Spots on Hands of Defendant.* Testimony as to spots or discoloration on the hands of the defendant, together with the statements of the deceased concerning them, was properly received.

8. SAME—*Instructions.* No error was committed in refusing or giving instructions touching the dying declaration of the deceased.

9. SAME—*Various Assignments of Error Without Merit.* No error was committed touching the admission of evidence concerning the finding of a carbolic-acid bottle, in permitting certain witnesses to testify whose names were not spelled exactly right on the back of the information, in sustaining objections by the state to questions asked the husband of the deceased as to various matters touching his relations and correspondence with her before their marriage, in respect to the conversation between the deceased and another party who called at her home, nor to a conversation had by another witness with the deceased touching such visit.

10. SAME—*Evidence—Dying Declaration.* Testimony in respect to the dying declaration examined, and found to be sufficient to go to the

jury on the question of the declarant's fear of impending death and as to the credibility of such declaration.

11. SAME—*Evidence—Dying Declaration.* The recital by certain witnesses of one or two items not contained in the written declaration, but probably contained in a verbal statement made the day before, held, in view of an instruction strictly limiting the dying declaration to the written statement admitted in evidence, not materially prejudicial.

12. SAME—*Evidence—Dying Declaration.* While a dying declaration, to be admissible, must be made under a sense of impending death, it is not necessary that it so state, nor is it necessary to show that the deceased was apprehensive of immediate dissolution, it being sufficient to show that he had abandoned all hope, and regarded his death as impending and certain as the result of the injury inflicted.

Appeal from Labette district court; ELMER C. CLARK, judge. Opinion filed May 11, 1918.   Affirmed.

*Archie D. Neale,* of Chetopa, for the appellant.

*S. M. Brewster,* attorney-general, *L. E. Goodrich,* county attorney, and *C. E. Pile,* of Parsons, for the appellee.

The opinion of the court was delivered by

WEST, J.: This is an appeal from a conviction of murder in the first degree, upon the charge of having administered carbolic acid to one Agnes Smith. The defendant is a colored physician about 33 years of age, who since a boy of 13 has much of the time been in the employ of Asa Smith, who helped him in securing a general and a medical education. The defendant used Mr. Smith's horse and buggy in making his professional calls. For many years before the homicide he called at the Smith place nearly every morning and fed the horse, after which he would make his calls and return with the rig from 10 to 11 o'clock in the forenoon. Agnes Hammack had lived with the first Mrs. Smith a short time before the death of the latter. Mr. Smith had partially educated Agnes, and she became his second wife in 1916, being about 24 years old when she died. About 11 o'clock in the forenoon of May 16, 1917, the defendant was seen by several witnesses riding in the Smith buggy in the alley driving towards the barn. Between 11 and 12 o'clock he came to the home of Mrs. Lulu Smith, where he remained for dinner, and, after stating that he did

not feel well, lay down and went to sleep and slept until about
five o'clock. The defendant himself testified that on the morn-
ing in question he was at the Asa Smith home about 8 o'clock,
that he went in the short way and around the house and spoke
to Mrs. Smith when at the barn, and fed the horse, harnessed
him and, when he finished eating, hitched up and made some
calls; that later he returned the horse and put him up, and
started to his mother's to tell her he would not be to dinner,
went to his office and then down to Mrs. Lulu Smith's; that he
left Asa Smith's between 10:30 and 11; that after he had din-
ner he did not feel well and lay down and went to sleep, having
been a frequent visitor at the Lulu Smith place for years; that
after supper he started for his office and heard that men were
hunting for him and accused him of being the cause of Mrs.
Smith's condition, and, being afraid of a mob, he returned to
Lulu Smith's and stayed all night.

Mrs. Neighbors, who lived next door to the Asa Smith place,
testified that about 11:30 in the morning she heard screams
from Mrs. Smith; that shortly thereafter she went to her door
and, finding her there, asked her if it was gas, and Mrs. Smith
said "No, no"; that she and Mrs. Dixon assisted in carrying
her into the house; and that she called for Mr. Athy, and they
all carried Mrs. Smith into Mrs. Neighbor's house and laid her
on a couch, and then called Dr. Albert Smith and Dr. Board-
man.

Mrs. Williams testified that she lived with Mrs. Neighbors,
and that she heard screams about 11:30 from the Smith home
and heard Mrs. Smith say, "Oh, Mrs. Neighbors, oh, Mrs.
Neighbors."

Agnes Smith was found to be burned with carbolic acid. Dr.
Boardman testified that—

"The odor was very strong. The acid was up in her hair, over her
face, and down on her upper chest. The acid was upon her cheeks, around
on the back of her neck and around her ears. Her eyes were entirely
burned. One had turned entirely white. . . . she was unconscious."

The testimony showed that from carbolic poisoning she died
May 24. An empty bottle was found on the dining-room floor,
wrapped in some kind of wrapping paper, which smelled of car-
bolic acid. It had no label on it. The stopper was found in the
front room near the door. On May 19 the defendant, who was

then in jail at Columbus, was examined and found to have spots
on his hands that were rougher than the general skin. There
were marks, discolorations on both hands, spots that were
rougher than the general skin. One physician testified that he
asked the defendant where he got the burns, and, as the wit-
ness remembered, he said he did not know. There was also
medical testimony indicating that in the opinion of the phy-
sicians certain marks on the throat of Mrs. Smith were not
caused by acid, but by pressure. On May 17, having been in-
formed by Dr. Boardman that she could not live, Mrs. Smith
made a dying statement, of which the following portion was
admitted in evidence:

"Parsons, Kansas. At Asa Smith's home. May 17, 1917. I know
that I am about to die and this is my statement in the fear of death.
Bob Smith came in at about 11 o'clock a. m., May 16th, and says why
don't you treat me better—why have you got it in for me? I picked up
some scissors, off the table, and he started for me and he took them
away from me and seized me by the throat and choked me and threw me
on the floor. He choked me and poured something in my mouth and
face and ran out, and I got up and got to Mrs. Neighbors' and lost
consciousness.                                          her
                                        AGNES  ✕  SMITH
                                              mark."

A sister and the mother of the defendant testified that, some
two months after the arrest, the sister went to his office in
Parsons for the purpose of removing his goods, and discovered
a small bottle with some carbolic acid in it, which she took to
her mother, who had asked for some disinfectant, the mother
testifying that she used it for that purpose. The defendant
testified that he had occasion to use carbolic acid on the 15th
of May, and sent his office boy for it on that day, and then
went down and got it himself and used some of it on two
patients, and set the bottle on a little table in the corner. Two
witnesses searched the office of the defendant on the day of
the tragedy and testified that they found no such bottle as
that exhibited by the defendant, one of them testifying that
such bottle was not in the office on that day. In respect to the
spots on his hands the defendant testified that he had used
iodine in treating patients, and described the spots which iodine
would cause. The defendant not only denied all guilt and all mo-
tive therefor, but brought numerous witnesses to testify as to
his high standing as a peaceable, law-abiding citizen. He testi-

fied as to the poor health, nervous condition, and suicidal tendency of Agnes Smith, of frequent curses and abuses heaped upon her by her husband, and of his repeated assurances to her that he did not love her; that Mr. Smith had told him he could not have any peace at home and was afraid his wife would kill him when he was asleep; that during the past winter he brought his gun to the barn and hid it, telling the witness that the night before he found his wife standing over him with it; that on another occasion Mr. Smith called him and told him his wife had attempted to commit suicide with chloroform, and wanted to know what to do; that another time she attempted suicide, and Smith told him to be careful, that his wife was liable to injure either him or the defendant; that his relations with Mrs. Smith had always been of the best until Mr. Smith began poisoning her mind against him, by telling her he thought more of the defendant than of her; that on the morning of May 16, 1917, Mrs. Smith asked her husband to kiss her good-bye, which he refused to do, responding with curses. He testified that on one occasion Jack Connors went to the Smith house with him, Mrs. Smith having asked the witness to tell Connors that she wanted to see him; that on Smith's return from Oswego that day he asked the witness if any one had been at the house and was told that Jack Connors had been there; that some weeks afterwards Mrs. Smith called him to the house and asked him to tell Mr. Smith that she had not asked for Connors to come to the house, which he refused to do; that when she asked her husband if he would take the defendant's word before hers he said he would, and that he thought more of him than he ever would of her. One witness testified to some remark made by the defendant as to why Smith did not get a divorce from his wife. Asa Smith denied having told the defendant that he found his wife standing over him with a revolver or that he hid the knives and revolver to prevent his wife from using them, and denied having told her some of the things testified to by the defendant. A witness for the state testified that on the morning of the 16th, when Mr. Smith left, his wife walked out to a little flower bed and spoke to Mr. Smith, who looked around, and she said good-bye and waved at him. A neighbor testified to a conversation with Mrs. Smith over the telephone, just before the tragedy, in which Mrs.

Smith appeared very cheerful and was joking. There was also testimony indicating that Mr. Smith, who took a short journey on the 16th, found in his grip a note from his wife, accompanying a necktie she had made, expressing her love and congratulations upon his sixtieth birthday.

The defendant assigns numerous errors touching the instructions, the reception and rejection of evidence, and the overruling of challenges to certain jurors.

Complaint is made that the court overruled challenges for cause to jurors Dean and Roller. Each of these jurors, after having been examined by the parties, told the court in substance that he knew nothing concerning the facts of the case, and that his mind was in such condition that he could sit and try the case as fairly and impartially as though he had heard nothing about it. In *The State v. Stewart,* 85 Kan. 404, 116 Pac. 489, it was held that if upon the evidence the trial court decides that the juror is free from bias, prejudice, or interest, and has not a disqualifying opinion, its decision will not be disturbed on appeal unless disqualification appears as a matter of law, or an abuse of discretion is disclosed. A similar rule was announced in *The State v. Pearce,* 87 Kan. 457, 124 Pac. 814; *The State v. Molz,* 91 Kan. 901, 139 Pac. 376; *The State v. Compton,* 94 Kan. 642, 146 Pac. 1161; *The State v. Mullins,* 95 Kan. 280, 291, 147 Pac. 828. The case falls within this rule.

Another juror stated that he had heard that Agnes Smith had made a dying statement. He was then asked whether he had an opinion that when making the statement she believed she would not recover. An objection to this question was sustained. The only possible competent question would have been as to whether he had an opinion on the subject, and not to state what his opinion was. Appellant's abstract states that the juror would have answered the question by stating that he did have an opinion on that question. The juror testified that he was not acquainted with Agnes Smith in her lifetime and knew of no reason why he could not be a fair and impartial juror; did not entertain an opinion that she had been assaulted; and did not remember having talked with anybody about the crime. Under the circumstances shown, it was not material error to sustain the objection to the question propounded.

The defendant, while on the stand, was asked on cross-examination whether or not in May, 1916, he had called Asa Smith to Muskogee, and, over objection, answered that he had. He was then asked whether he then stated to Asa Smith that he was the father of the unborn child of the Jackson girl at Parsons, to which he replied, "I certainly did not." Asa Smith was called in rebuttal and testified that at the time and place in question he did make such statement. This is complained of as material error. The general rule is that one on trial for a given offense cannot be proved guilty of other and different offenses, and that, while the defendant may be thoroughly cross-examined as to his former conduct, the state is bound by his answers on collateral matters and cannot offer evidence in rebuttal. The general reason for the latter rule is that otherwise all manner of outside issues would enter, and the main controversy might become confused and confounded with various other questions, to the distraction of the jury and the delay of justice. It is urged, however, that as the defendant had placed his own character for a peaceable and law-abiding citizen in issue and introduced numerous witnesses in support of his reputation as such that it was proper for the state to show by way of rebuttal that he made the admission testified to by Mr. Smith. In *The State, ex rel., v. Stout,* 101 Kan. 600, 168 Pac. 853, the defendant in a bastardy proceeding was asked on cross-examination if he had been guilty of improper conduct with a young girl other that the relatrix, and he denied that he had. It was held to be purely collateral, by which the state was bound, and it was decided that it was reversible error to permit the state to contradict this denial by evidence of another and distinct offense. In the opinion it was said:

"The evidence was offered for the purpose of impeaching his testimony. . . . A belated attempt is made in the briefs to excuse the admission of this testimony on the ground that it rebutted the evidence of good character offered by the defendant; and further, that it was admissible to rebut statements made by his counsel in the opening statement to the effect that the defendant did not associate much with girls, was not given to running around with them, but was a good, quiet, clean boy." (p. 605.)

In concluding the discussion it was said:

"Besides, being a collateral matter, the prosecution was bound by defendant's answer." (p. 606.)

Evidence of general good reputation is not to be rebutted by testimony of specific instances of misconduct. (*The State v. Frederickson*, 81 Kan. 854, 106 Pac. 1061.) It was error, therefore, to receive the testimony, but considering the nature of the offense for which the defendant was on trial, the fine reputation accorded him by his character witnesses, and the remoteness of the one remark at Muskogee, the error does not impress the court as one of sufficient importance to constitute material prejudice requiring a reversal.

It is urged that the note found in the grip of Mr. Smith on his return was improperly received in evidence, but one theory of the defense was that the deceased committed suicide, and, in view of this and of the abuse on the part of the husband testified to by the defendant on the morning of the tragedy, this note, together with the testimony of the witness who claimed that the wife waved the husband good-bye, and of the neighbor who told of her cheerful conversation over the telephone a few minutes before the tragedy, was competent as touching Agnes Smith's state of mind.

Mrs. Neighbors, who testified that the screams seemed to come all from the same place, was asked if on the preliminary examination she had not testified that they did not sound as if they came all from the same place, to which she replied that she did not know what she said at that time. The question was then read from the record, and she was asked if she did not answer as there shown, and an objection to the question was sustained, of which complaint is made. The witness might well have been permitted to answer, but it is impossible to see how the refusal worked any prejudicial error to the defendant. She had already testified that she did not know what she said on the preliminary, and even if at that time she had stated that the screams did not seem to come from one place, and even if such had been the fact, there can be no doubt from whom they came, and the immediate place does not appear to be of material importance. Neither would the discrepancy, if shown, have sufficiently tended to impeach or impair the credibility of the witness to be of material significance.

The State v. Smith.

Dr. Albert Smith was asked the nature of Agnes Smith's ailments at different times when he called upon and treated her, but was not permitted to answer. The defendant complains of this as a deprivation of his right to show her highly nervous and hysterical condition naturally tending toward suicide. When the defendant was on the stand he was permitted to go into this matter, and, had he desired the testimony of Dr. Smith on this point, he might have introduced him as his own witness. It was not error to sustain an objection to going into this matter on cross-examination of the state's witness.

The testimony of those who examined the defendant's arms in the jail is complained of, but we think it was competent for whatever the jury may have properly deemed it worth after listening to the defendant's own version of the matter, and there was no error in its reception.

Certain instructions touching the dying declaration of the deceased were refused, but we have examined those given and have found them to be entirely fair to the defendant and in accord with the law, hence, no error in this respect was committed.

Neither do we find any error touching the admission of evidence as to finding a carbolic-acid bottle, nor in permitting certain witnesses to testify whose names were not spelled exactly right on the back of the information, nor in sustaining objections by the state to questions asked Asa Smith as to various matters touching his relations and correspondence with his second wife before their marriage.

Complaint is made that John J. Connors was permitted to testify, on rebuttal, to a conversation had with Agnes Smith at the time the defendant invited him to call at the house. Very little of this testimony was permitted by the court, as the record shows, and, in view of the defendant's own testimony, no error as to him was committed in respect thereto.

Mrs. Walcott was permitted, in rebuttal, to tell of a conversation of Agnes Smith touching the visit of Jack Connors, and that the trouble over that matter had been adjusted. Mr. Smith, when on the stand, testified to the same adjustment, apparently without objection, and, while the testimony of Mrs. Walcott as to the conversation with Agnes Smith was not competent, it does not appear to have materially prejudiced

the defendant. In fact, it is substantially admitted in his brief that a number of these matters were hardly material.

This leaves the one remaining question as to the competency of the dying declaration and the testimony pertaining thereto.

The defendant claims that the dying declaration was admitted improperly, because not shown to have been made under actual fear of impending death, and, also, that after its admission numerous witnesses were permitted to testify to the statements therein contained, and also to other statements which were incompetent. It being impossible to understand the situation from the abstracts, the transcript was sent for, and there it appears that the jury were excused for the purpose of allowing the court to pass upon the statement before testimony in regard to it was offered. The court examined the written statement and underscored certain words to be excluded therefrom, admitting the remainder as already set forth. The jury being recalled, Dr. Boardman testified, among other things, that he was at the Asa Smith home on the afternoon of the 17th with a number of others; that Agnes Smith said she felt that she could not get well and was going to die; and that the written statement contained substantially what she said. His attention being called to the portions stricken out by the court, he then recited substantially the remainder; he stated that after she made the statement he wrote it down the best he could from memory and read it to her; that she corrected one little statement and then signed it, that is he wrote her name and she touched the pen and made a cross. From the statement as written and signed the court excluded the following:

"All I told Mr. C. E. Pile and Mrs. Billbruck, Mrs. Walcott and Dr. Smith and Mrs. Kersey and E. W. Boardman yesterday was true. . . . I told him to get out of the house and  . . .  I feared he would rape me."

On cross-examination he stated that he wrote the paper in the other room; that before that he had asked her if she thought she was going to get well, and explained to her that it would be necessary to have a statement in order to present the matter to the court, and that it was necessary that it should be a dying statement; that he possibly told her it would be necessary to put in the statement that she was about to die; and that on two or three different occasions before and after this

she had said she was going to get well, in which he encouraged her as a means for her benefit.

Doctor Smith testified that after the statement was made and signed it was signed by those present.  He then testified substantially to the language contained in the statement; that Doctor Boardman had told him he was going to get a statement of Mrs. Smith, and then Mr. Pile had said it was necessary to have the dying statement say that she was about to die, and that it was necessary to have her dying statement; he was not sure that he said it was necessary to have the dying statement say that she thought she was about to die.  Doctor Boardman came in from somewhere and wrote the statement, and Doctor Boardman said to Agnes Smith that she realized she was in a serious condition and was about to die, and he would like a statement from her.  A few minutes before that Doctor Boardman had told him that he thought she was going to die and it was necessary to get a statement; that Agnes Smith apparently got better after this, up to forty-eight hours before her death, and stated that she was going to get well, and that the witness made similar statements for the purpose of encouraging her.

Mrs. Walcott testified that just before the statement was made the doctor said it was impossible for Mrs. Smith to live. Witness then detailed the statement made by Mrs. Smith, including one to the effect that the defendant asked her if there was a rat trap there that belonged at the barn, "and she said she thought there was, in the storeroom adjoining the house," and witness understood her to say that "she got the trap and started back in her dining room as he opened the door and followed her in," also that "he put his hand toward his pocket and she thought he was going to shoot her and she said 'don't shoot me' and he said 'I have got something worse than shooting.'"  On cross-examination it appeared that part of this statement may have been made the day before, the witness saying it was very hard to distinguish between the statements on the two succeeding days.  She then undertook to repeat the one made on the 17th, which corresponded quite well with the one received in evidence.  Whatever of this statement which included only what was said on the day previous was of course incompetent, because then there was no fear of impending

death, and it was all received over that objection of the defendant. But there was no motion to strike out any part of the entire statement after the witness had told her story.

Hazel Reamer, sister of the deceased, testified that after the statement was made Doctor Boardman wrote it and took it to Agnes Smith and read it to her and asked her if it was correct, and she said it was, and the witness identified it, except as to the words excluded, as the one she signed as a witness, and testified in detail to the statement substantially contained therein, adding a reference to the rat trap and a statement as to being all dressed but the outside skirt; that before the statement was written Doctor Boardman had talked with Mrs. Smith and told her she was going to die; that Doctor Boardman told her she was about to die, and to make this hold good in court she would have to make a statement, something to that effect.

After this testimony, the declaration, except the excluded words, was again admitted by the court. The jury were instructed that it was exclusively within their province to weigh and determine the truth or falsity of the declaration, taking into consideration the facts that the defendant was not present, that there was no opportunity for cross-examination, and that the declarant was not subject to prosecution for perjury; that if they believed from the evidence beyond a reasonable doubt that at the time of making the same she was of sound mind and believed that death was impending and entertained no hope of recovery then they should give such declaration, if proved, such weight and credit as in their candid, fair, and truthful judgment it was properly entitled to. It is clear that the written declaration of May 17, as deleted by the court, was treated and considered as the only one before the jury, no reference to any other statements being found in the careful and full instructions on this point, the charge referring to it as "the written statement," "such declaration," and "the declaration read to you."

The written declaration itself was confined to the assault and the circumstances immediately attending it, within the rule laid down in The State v. O'Shea, 60 Kan. 772, 57 Pac. 970. If the statements testified to by Mrs. Walcott and Mrs. Reamer had been shown to have been made under the fear of impend-

ing death, they would have been within the rule properly for consideration by the jury. In view of the entire situation, the inclusion by these two witnesses of the items not clearly shown to have been contained in the statement of May 17 cannot, in view of the careful instructions and restriction of the dying declaration to that contained in the writing admitted in evidence, be deemed to constitute prejudicial error against the defendant.

While dying declarations, to be admissible, must be made under a sense of impending death, it is not necessary that the declarant state that he is expecting immediate death, nor is it necessary to show that the deceased was apprehensive of immediate dissolution, it being sufficient to show that she had abandoned all hope and regarded her death as impending and certain as the result of the injury inflicted. (*The State v. Wilson,* 24 Kan. 189; *The State v. Aldrich,* 50 Kan. 666, 32 Pac. 408; *The State v. Reed,* 53 Kan. 767, 37 Pac. 174; 21 Cyc. 977.)

At least it must be said that there was sufficient evidence touching the fear of impending death to take the case to the jury and to support the conclusion reached by them and approved by the trial court. As said in *The State v. Furney,* 41 Kan. 115, 21 Pac. 213:

"It was a question of the admissibility of evidence and was governed by the same rules that govern the admission of all other evidence. The question is, was there sufficient evidence to sustain the ruling of the court? The court passed upon this question and there is abundant evidence to sustain the ruling." (p. 118.)

The record leads to the inevitable conviction that the cruel and atrocious crime charged was committed, and that whatever influences actuated him, or whatever their source, the defendant was legally found guilty.

The judgment is affirmed.