No. 25,414.

H. T. GRUBB, *Appellant,* v. C. H. SARGENT, *Appellee.*

SYLLABUS BY THE COURT.

1. PROMISSORY NOTES — *Unresponsive Answer to Special Interrogatory* — *No Ground for Setting Aside Verdict.* An unresponsive answer to a special interrogatory, not inconsistent with other special findings and not in conflict with the general verdict, is held not to be a good ground for setting aside the general verdict.

2. SAME—*Unresponsive Answers to Special Questions—No Request for More Appropriate Answers.* Where an unresponsive answer is made to a special question, it is the duty of the court, upon request of an interested party, to require the jury to retire and make an appropriate answer to the question, but one not making such request is not in a position to complain that the requirement was not made.

3 SAME — *Good Faith of Plaintiff in Purchase of Notes* — *Sufficiency of Evidence.* The evidence examined as to the good faith of the plaintiff in the purchase of promissory notes and as to whether there was an actual sale of the notes in due course to him, and held to be sufficient to sustain the findings and verdict of the jury.

Appeal from Smith district court; WILLIAM R. MITCHELL, judge. Opinion filed December 6, 1924. Affirmed.

*F. W. Mahin, Hilary D. Mahin,* both of Smith Center, *A. N. Gossett, F. E. Tyler, Edgar C. Ellis, Roy K. Dietrich,* all of Kansas City, Mo., and *J. Allen Prewitt,* of Independence, Mo., for the appellant.

*J. T. Reed, A. W. Relihan,* and *T. D. Relihan,* all of Smith Center, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: This was an action by H. T. Grubb against C. H. Sargent, upon two "myself" promissory notes executed by Sargent on June 7, 1921, each for the sum of $2,500, bearing interest from date at the rate of eight per cent per annum. They were delivered by Sargent to the agents of The Associated Mill and Elevator Company, and were later passed into the possession of the plaintiff. The result of the action was a verdict and judgment for defendant, from which plaintiff appeals.

It appears that persons representing themselves as agents of the mill and elevator company visited Sargent at Smith Center and induced him to purchase fifty shares of the common stock of the mill and elevator company, and for this purchase the notes in suit were

given. When the shares were sold to defendant it was represented that the mill and elevator company owned the stock; that the blue-sky board of the state had authorized the sale of the stock; that the stock was then worth $100 per share, and that the mill of the company would be in operation in a few weeks and the stock would then be worth $150 per share, and that if defendant did not wish to keep it they would resell it for him. When the sale was made none of the stock was owned by the mill and elevator company, but the entire issue had been transferred to T. S. McQueen; neither had any authority been given by the blue-sky board to sell any part of that stock, and when sold to the defendant the stock was worthless. At that time the mill and elevator company was insolvent, and shortly afterwards it passed into the hands of a receiver. Fraud in the inception of the notes was sufficiently shown in the trial, and counsel for plaintiff stated that plaintiff would not offer any evidence denying the representations which defendant had testified were made to him when the notes were executed. The position of plaintiff, it was said, was that he knew nothing of the misrepresentation and had purchased the paper without knowledge of the fraud. Plaintiff was a farmer living near Raytown, Mo., and was a stockholder in the Raytown bank. He was also a stockholder in the Blue Valley Bank, at Leeds, four or five miles away, where his principal account was kept. He testified that Partridge and Shands, assuming to act for the mill and elevator company, procured Smith, the cashier of the Raytown bank, to go with them to plaintiff's home, where the notes of Sargent were sold to the plaintiff for $4,750. When the sale was made the signature of the mill and elevator company was indorsed on the notes with a rubber stamp in plaintiff's presence, and the name of Partridge was signed below by McQueen. The owner of the stock for which the notes were given was not indorsed on either of the notes. Plaintiff states that he gave his check on the Blue Valley bank for $4,750 to Partridge, and that it was paid out of his account with that bank. It appears the notes were left with the bank, it was said, for safe-keeping. About September 15, 1921, defendant met and conferred with McQueen at the offices of the mill and elevator company about redeeming the notes in accordance with the previous agreement, but McQueen said the company could not do so at that time, but would be able to redeem them when the notes became due. About the time they became due defendant called on McQueen, who went with him to see Mr. Smith, the cashier of the

Raytown bank, who had the notes, and the three called on plaintiff at his farm, where defendant made an interest payment.

Among other defenses, defendant had alleged that plaintiff had knowledge of the fraudulent scheme by which the notes were obtained; that he had paid nothing for them, and was not the owner or holder in due course or otherwise. With the general verdict and in answer to special questions the following findings were returned:

"Q. 1. Do you find that the plaintiff purchased the notes in question in due course? A. No.

"Q. 2. Do you find that the plaintiff purchased the notes in question: (a) For value? A. No. (b) Before maturity? A. No. (c) Without notice of infirmity? A. No.

"Q. 3. Do you find the plainitff had knowledge of such facts that his action in taking the notes in suit amounted to bad faith? A. Yes.

"Q. 4. If you answer the last above question in the affirmative, state fully the facts of which plaintiff had knowledge? A. Because we find that the plaintiff did not show by sufficient evidence that he possessed the money with which to buy the notes."

Motions of plaintiff for judgment on the special findings to set them aside and for a new trial were overruled. It is contended that the answer to question No. 4 is in effect a finding that plaintiff had no knowledge of the fraud, and that therefore the general verdict should have been set aside. It is obvious that the answer is not responsive to the question. The jury, instead of stating the facts of which the plaintiff had knowledge, gave a reason for their former finding that there was no actual purchase of the notes by plaintiff. They had specifically found that no purchase had been made, and instead of giving an appropriate answer to the question gave one in explanation of the theory and finding which they had prominently in mind. The inaptitude of an answer to a question is not necessarily in conflict with the general verdict nor inconsistent with other special findings. It was the duty of the jury of course to make answers responsive to the questions asked, and it has been held that where a jury returns an unresponsive answer to a special question it is the duty of the court, upon request of either party, to require the jury to retire and make a direct and proper answer, and if the party interested in obtaining an apt answer does not make or join in such request he is not in a position to complain of the answer. (*Smart v. Mayer,* 103 Kan. 366, 175 Pac. 159.) No such request was made by plaintiff. Apparently he was satisfied to allow the unresponsive answer to stand as made. The question might have been withdrawn by him or

he was at liberty to waive the requirement of a direct answer, and his failure to ask for a responsive answer is in a sense a waiver of the inapt one returned. It is not in conflict with other findings nor with the general verdict.

It is further contended that the evidence does not support the verdict returned. The jury evidently discredited the testimony of the plaintiff. That there was fraud in procuring the execution and delivery of the notes was abundantly shown, and plaintiff offered no opposing testimony. When fraud in the inception of the notes was shown, the burden was cast upon the plaintiff to prove that he was a holder in due course. (*Ireland v. Shore,* 91 Kan. 326, 137 Pac. 926; *Beachy v. Jones,* 108 Kan. 236, 241, 195 Pac. 184; *Consolidated Motors Co. v. Urschel,* 115 Kan. 147, 222 Pac. 745.) It is insisted that plaintiff successfully met this requirement. He positively denied any connection with the manipulation with the parties who fraudulently procured the notes or that he had any knowledge of anything affecting his title. There were circumstances brought out which may have led the jury to doubt his asserted innocence or that there was in fact a real purchase of the notes. It appears that he was a man of moderate means, and the amount alleged to have been paid for the notes constituted a large part of his assets. It having been denied that he had the means to purchase the notes, he undertook to show that he had funds to do so, but there were some inconsistencies in his testimony respecting his resources. In a deposition taken before the trial he stated that his money resources consisted of $350 which he had received from his mother's estate and which was deposited in the Raytown bank, and $1,500 received in a real-estate transaction, which was deposited in the Blue Valley bank. These items were far short of the amount claimed to have been paid for the notes, and when it came to the trial he added another item, stating that he had an additional $3,000 which had been received on a forfeit on a real-estate contract. He stated that he had forgotten this $3,000 item when he first testified. He did not produce the contract upon which he claimed the forfeiture had been made. Although he stated it was deposited in the bank, he did not offer to show any deposit slip, receipt or other evidence that the money was received or deposited as stated. The tax returns showed that plaintiff did not claim the ownership of the notes. At the assessment following the alleged purchase the notes were not listed by him for taxation. Again the notes remained in the bank in the custody of Smith,

Grubb v. Sargent.

the cashier of the Raytown bank, the officers of which were active throughout all the transactions. Smith was present when the transfer was made. He had dealt in other pieces of mill and elevator property, and is said to have recommended the purchase of the notes in question. He was a neighbor of McQueen, the owner of all the capital stock, and was with McQueen when the interest payment was made and negotiations were had as to further time for payment. McQueen, as we have seen, owned the stock and necessarily knew of the insolvency of the company, and of course knew that it would be easier to make the collections on the paper if the notes were in the hands of one who was apparently an innocent holder. The bank, it appears, was keeping in close touch with all the transactions concerning the notes. An officer of the bank was present at the time of the rubber-stamp transfer, also when the interest was paid, when the suit thereon was brought and when the trial was had. It was a subject for consideration that the plaintiff obtained the notes which were signed by one he had never heard of before, had accepted the indorsement of a company of which he had no knowledge, which was written with a rubber stamp and signed by one who was a stranger to him. On the whole it was a fair question for the jury to determine whether the circumstances mentioned, as well as some others that have not been mentioned, were sufficient to overcome the direct testimony of the plaintiff as to whether there was a *bona fide* sale and transfer of the notes and as to the good faith of the plaintiff in the transactions. (*Bank v. Freeburg,* 84 Kan. 235, 114 Pac. 207; *Beachy v. Jones,* 108 Kan. 236, 195 Pac. 184; *Security Co. v. Low,* 112 Kan. 153, 210 Pac. 190.)

There is an objection to rulings on testimony, but we find nothing substantial in it, and no sufficient ground to warrant a reversal.

The judgment is affirmed.