No. 29,563.

IONA S. BAGNALL, Executrix of the Estate of William H. Bagnall, Deceased, *Appellee*, v. JOSEPH HUNT, *Appellant*.

(293 Pac. 733.)

Opinion filed December 6, 1930.

*C. W. Burch, B. I. Litowich* and *La Rue Royce,* all of Salina, for the appellant.

*Z. C. Millikin* and *Alex H. Miller,* both of Salina, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.:   Iona S. Bagnall, executrix of the estate of William H. Bagnall, deceased, brought this action against Joseph Hunt to recover damages for the death of her husband resulting from a collision of automobiles on a public highway.   She recovered damages in the amount of $10,000 and the further sum of $310 for damages to the Bagnall automobile.   The defendant appeals.

Road number 81, it appears, runs north and south, and there is a public road intersecting with number 81, running east for a considerable distance.   Bagnall was on the east road driving towards road 81 about 6:30 p. m. on December 7, 1928.   It was then dark and the lamps on his car were burning.   When he approached road 81 he saw two cars with lights on, coming on that road from the south, and he halted his car for them to pass.   After they had passed he started west across 81 towards a private road leading to his home, which was near by.   When Bagnall reached the center of road 81 his car was struck by the Hunt car and practically demolished. In the collision Bagnall's neck was broken and he was paralyzed from his neck down, but he was still conscious and his mind was clear.   He was taken to a hospital, where he was visited by Hunt, and there is testimony that Hunt then admitted that he was to blame for the accident and stated then that he was insured and he would pay all expenses and damages resulting from the collision.   Special questions were submitted to the jury to which the following answers were returned:

"Q. 1. How far was Bagnall into 81 when he was struck?   A. The front end of Bagnall's car was approximately three feet beyond the center of the road.

"Q. 2. At what rate of speed was he driving?   A. Don't know.

"Q. 3. What part of his car was struck?   A. Right side just in front of the windshield.

"Q. 4. Where was Hunt when Bagnall entered 81?   A. Somewhere north of Bagnall on highway 81.

"Q. 5. At what rate of speed was Hunt driving?   A. An excessive rate.

"Q. 6. How wide was highway 81 from shoulder to shoulder?   A. About thirty feet.

"Q. 7. How wide was the traveled part of 81?   A. About twenty-seven feet.

"Q. 8. Was the center line of the road east about 38 north of the center line of the road west? A. Yes.

"Q. 9. In what part of 81 was Hunt driving at the time of the collision? A. Left front wheel about in the middle of the center of the road.

"Q. 10. Did any car come from the north to the place of the accident, except the Hunt car and the Fowler car, until long after the accident? A. We don't know.

"Q. 11. Did Bagnall see Hunt's car coming from the north while he was waiting for the two cars to pass north? A. Yes.

"Q. 12. If Bagnall had looked north on 81 after defendant passed the two cars going north, could he have seen defendant's car? A. Yes.

"Q. 13. With reasonable diligence could Bagnall have seen Hunt's car approaching him for a distance of at least one hundred feet from the point of collision? A. No.

"Q. 14. If Bagnall, after he entered 81, had looked and had seen defendant's car coming from the north, could he, in the exercise of reasonable diligence, have stopped his car in time to avoid a collision? A. No.

"Q. 15. In the exercise of due care, could Bagnall have stopped his car less than ten feet at any time after he started his car to enter 81 and before he reached the center line of 81? A. Yes.

"Q. 16. Was Bagnall guilty of negligence which contributed to his injury? A. No.

"Q. 17. If you find for the plaintiff, what do you allow her: (a) For medical and surgical treatment and for nursing? A. $503. (b) For casket and undertaker's services in Kansas? A. $370. (c) For expenses of transporting the body to Iowa for burial? A. $42.98. (d) For funeral expenses in Iowa? A. $48.50."

Defendant contends that there was error in the admission of what is termed dying declarations made by Bagnall to several persons shortly before his death, and that other testimony pertaining to the case was improperly admitted. A witness, C. N. Fowler, who was a partner of the deceased in the poultry business, visited Bagnall shortly after the accident and among other things testified concerning the belief of Bagnall that death was impending. Bagnall told him that doctors said that he could not live, that Bagnall then asked the witness to be good to his wife, and give her good advice and help settle up the business and be fair to her. Then speaking of the accident, Bagnall told him that he drove up to road 81, stopped for two cars to pass, then started across 81 and just as he drove on the road the other car struck him; that he did not see the Hunt car, that there were no lights on it; and further that there were lights on his own car. This testimony was admitted over general objections and that it was incompetent, irrelevant and immaterial and hearsay.

Roy D. Plott, a minister of the gospel, was a witness and called on Bagnall after he was taken to the hospital on the day following the accident, and in his testimony stated that Bagnall asked the witness to pray for him, that he felt that he was going into the presence of Jesus, and was ready to go. After stating that he did not expect to live, said in substance that he was struck by an automobile, driven by Mr. Hunt, that Mr. Hunt, himself, told him that he was to blame. Defendant objected to the testimony and asked that it be stricken out as not being a dying declaration, but was hearsay, self-serving and no part of the *res gestæ*. The objection was overruled.

G. A. Bagnall, a brother of the deceased, was a witness and after testifying that the deceased was a man of good habits, said that he reached his brother between two and three o'clock of the night following the accident and was told by the deceased that he had feared he could not live until his brother arrived; that he had a broken neck and was going to die, and wanted his brother to have a will made for him. That will was made. As to the accident the deceased told his brother that he drove up to the main street and sat in his car until automobiles passed him and then started across the street when something hit him. The brother asked the deceased if there were lights on the other man's car and he replied that there couldn't have been, and said, "I was driving across the street and no matter how far away the lights were, I could have seen them. There were no lights on that car and there were lights on my car." He further stated to the witness that he bore no ill will to Mr. Hunt, as Hunt had come to the hospital and said that he was sorry about the accident, that he was to blame and wanted the deceased to have the best there was in the hospital and the best doctors they could get. That he, Hunt, would see that all the expenses would be taken care of, both the expenses of the automobile and personal damages, as he carried plenty of insurance. The witness further testified that he was with his brother practically all the time until his death, and that he never expressed any hope that he could live, but always said that he was going to die. Objections to the testimony were made, that it constituted hearsay, too remote and the declarations were not made in contemplation of impending death. These objections were overruled.

Another witness named Nesmith testified of calling on the deceased about eight o'clock on the morning after the accident, and

testified as to a statement made by Bagnall as to whether he believed he was about to die or that death was impending. The witness said that he inquired of the deceased how he was and the reply was that he was not very good. When the witness said to him, "You will be out of here in a few days," he answered, "No, Hal, I will never get out of here." The witness then said, "You ain't as bad as that," and he said, "Yes, my neck is broken," and then added to the witness, "I am glad you are here, and I know you will do all you can to help Iona, my wife," and the witness responded that he surely would. Then he went on to say that the doctors had told him he couldn't live and in that connection he spoke about doing something for his wife, asking him to help her when he was gone. In speaking of how the accident occurred the deceased said substantially as had been told by other witnesses, that he came up on the east road which goes into 81, that he stopped for two cars to pass, and then drove on towards his home and got nearly across when a car coming from the north hit him. The witness said he asked him, "Did you see this other car?" and he replied, "No, Hal, I didn't." Witness asked him about lights, and he said, "If he had lights, I didn't see them." That he had seen lights on the other two cars that passed him. The first he saw of the Hunt car was when it hit him. Similar objections to those previously made were urged against this testimony. This witness also spoke of a statement by the deceased that he would like to see the Reverend Plotts, and that they went and brought the minister to the hospital. This witness also told of the deceased calling his sons to his bedside, advising them that his time had come, that he couldn't live long, and that he desired them to be good boys and do all they could to help their mother. That the boys would have to work for her now, and he exacted a promise from them that they would follow his request. The wife of the deceased testified that she was present when Hunt called on her husband shortly after the accident and she stated that he came in saying he was very, very sorry, that he was to blame for the accident, for them not to worry about the expense; everything would be paid for, the car, damages and all expenses; that he was insured and the insurance company would settle it all.

Defendant contends that the dying declarations were improperly admitted in evidence, in that they contain statements distinct from the accident and matters of opinion and also conclusions. The objections made by defendant were mostly general in character and to

the entire statement. Most of them were not accompanied with a motion to strike out the part pointed out as inadmissible. If part of a statement is admissible and a part is inadmissible, a general objection that it was incompetent, irrelevant and immaterial, directed to the whole of it, is ineffectual. In *State v. Bonar,* 71 Kan. 800, 81 Pac. 484, speaking of a dying declaration admitted in evidence, it was said:

"Contained in it were some facts not properly provable by a dying declaration but no motion was made to exclude them. Under the elementary rule the objection to the declaration as a whole did not reach this defect, and no prejudice resulted, since the defendant when a witness in his own behalf related substantially the same facts." (p. 804.)

See, also, *People v. Attema,* 75 Cal. App. 642; *Commonwealth v. Smith,* 213 Mass. 563; *Marshall v. State,* 219 Ala. 83.

Later, however, and at the close of the plaintiff's testimony, motions to strike out the testimony of two of the witnesses were made and overruled. The grounds of the motions were themselves general, as were the objections made when the testimony was offered. The defendant did not point out specifically the parts of the statements claimed to be improper. A motion to strike out the entire testimony, including that which is proper as well as that which is improper, is not good where any part of the testimony is admissible. The testimony shows quite clearly that the deceased understood the nature of his injury and believed that he could live only a brief time. A doctor, as well as a surgeon, had told him after an examination that his neck was broken and that he could not get well. The deceased did not even express to the doctors a hope of recovery. He did submit to an operation urged by his brothers, but he told them it would do no good. Although he finally acquiesced in the wishes of his brothers, it is manifest there was no change of opinion that he believed his injury to be fatal. The surgeon found in the operation that the vertebra had been driven into the cord and had injured it. The surgeon removed the fifth and sixth cervical vertebra, but no benefits resulted and death followed on the morning of the next day. The lapse of time between the accident and the death of Bagnall, or between the time when the declarations were made and his death, did not render the testimony inadmissible where it is shown that the declarations were made in the belief that he was in a dying condition. It has been said:

"While dying declarations, to be admissible, must be made under a sense of

impending death, it is not necessary that the declarant state that he is expecting immediate death, nor is it necessary to show that the deceased was apprehensive of immediate dissolution, it being sufficient to show that she had abandoned all hope and regarded her death as impending and certain as the result of the injury inflicted." (*State v. Smith,* 103 Kan. 148, 161, 174 Pac. 551.)

Nor should such declarations be denied admission because several oral declarations were made at different times. (3 Wigmore on Evidence, 2d ed., 184; 30 C. J. 258.)

As to the objections and motion to strike it may be said that if they had been sufficiently specific to raise the admissibility of parts of the statements, the ruling admitting them would not necessarily, we think, have required a reversal. Most of the testimony challenged related to whether the declarations of Bagnall were made under a sense of impending death, and this fact appears to have been well sustained. A *prima facie* case having been made that he was conscious of his dying condition, the declarations were then made. These declarations related to the circumstances of the accident, including the lights on the cars, how far cars could have been seen at that time, the place on the highway where the collision occurred, and the admission of Hunt shortly after the collision that he was to blame for the accident. These were matters about which Bagnall could have testified if he had survived the injury. One of the statements that Hunt had admitted responsibility for the accident was shown by testimony other than that given by the declarant. While some parts of the statements may have been objectionable in that they were expressed in form of conclusions or opinions, concerning matters of little importance, a reading of the whole testimony, we think, shows that errors, if any were made in that respect, cannot be regarded as prejudicial such as would compel a reversal.

Error is assigned on the overruling of the demurrer to plaintiff's evidence upon which it is argued that Bagnall was guilty of contributory negligence. Under the demurrer full credit must be given to plaintiff's testimony and every inference based on his evidence favorable to plaintiff must be drawn. Only evidence which is favorable to plaintiff is to be considered on the demurrer. Under these tests we cannot say that the evidence produced did not tend to support plaintiff's right of recovery. As to contributory negligence the evidence is deemed sufficient to show that the question is

one for the determination of the jury. Contributory negligence is a matter of defense and the burden of proving it rests on the party asserting it. No error was committed in overruling that demurrer.

There is complaint of misconduct of plaintiff's counsel in the argument made to the jury. In the opening argument one of plaintiff's counsel referred to a statement by a witness that defendant had admitted he carried automobile insurance and said that "maybe his insurance policy required him to deny liability." An objection to the statement was made which was sustained by the court. Thereupon counsel for plaintiff apologized for making the statement and withdrew it. The court admonished the jury to disregard the remark. Testimony had been introduced without objection that the defendant had admitted he was to blame for the accident and that he would pay all damages, adding that he was insured and the insurance company would settle it all. Plaintiff claims that the matter of insurance being thus brought into the record and having been received without objection, justified the comment. Assuming that the comment was not warranted, we think it cannot be regarded as a ground for reversal. The withdrawal of the remark by counsel and his apology for making it, together with the admonition of the court to the jury to disregard it in the consideration of the case, did not mislead or prejudice the jury. It is contended that the admonition of the court could not well remove the effect of the prejudicial remark, and cases holding that view are cited. Our rulings are that when an improper remark is made in argument which is stricken out by the court, with an admonition to the jury to give it no consideration, does not necessarily constitute reversible error. To overturn a verdict prejudice must be shown. In *Stimpson v. Motor Car Co.*, 114 Kan. 363, 219 Pac. 501, it was said:

"In argument to the jury plaintiff's attorney made use of an improper standard by which to measure damages. The court sustained objection to the argument, and instructed the jury to disregard it. The defendants cite decisions holding prejudice should be presumed notwithstanding the court's action. There is no such rule in this state. To work a reversal, prejudice must appear, and prejudice does not appear here because the amount of the verdict was warranted by the evidence." (p. 366.)

In *Smith v. Cement Company*, 86 Kan. 287, 120 Pac. 349, the court said:

"Where the court withdraws from the consideration of the jury the offensive statements or remarks and directs the jury not to consider them, it will be presumed, in the absence of any affirmative showing to the contrary, that the

misconduct did not affect the verdict or prejudice the rights of the defeated party. It rests in the sound discretion of the trial court to determine from all the circumstances whether the irregularity or misconduct may have influenced the jury in arriving at their verdict. Ordinarily where the trial court has directed the jury to disregard the matter, and with full knowledge of all the circumstances has approved the verdict and has overruled a motion for a new trial based upon the ground of such misconduct, this court will not reverse the judgment." (p. 289.)

See, also, *Ohlson v. Power Co.*, 105 Kan. 252, 182 Pac. 393; *Howard v. Motor Co.*, 106 Kan. 775, 190 Pac. 11; *State v. Tudor*, 121 Kan. 762, 250 Pac. 296.

There is a contention that upon the special findings of the jury judgment should have been given for the defendant; that findings 5, 10, 13, 14 and 16 are contrary to the evidence, and that his motion for a new trial should have been sustained. As to number five, it is said that the answer is a mere conclusion and that there was evidence upon which a definite answer could have been given. In response to the question at what rate of speed Hunt was driving, the jury answered, "An excessive rate." A more definite answer might have been given and probably would have been if defendant had asked for it. If an answer to a special question is deemed by the complaining party to be indefinite or unresponsive, he should ask the court to require a more definite or responsive answer. It appears that no request of that kind was made by defendant. One who fails to make a request is not in a position to complain of the answer. (*Grubb v. Sargent*, 117 Kan. 233, 230 Pac. 1043. See, also, *Smart v. Mayer*, 103 Kan. 366, 175 Pac. 159.)

Defendant contends that the finding to the effect that the deceased could have seen the Hunt car coming from the north while he was waiting for two cars going in another direction, shows contributory negligence of the deceased and defeats a recovery. That the deceased saw the Hunt car coming from the north does not settle the question that he was not exercising reasonable care in starting across road 81. How far the Hunt car was from the intersection when seen was not found. If seen at a distance that afforded the deceased ample time to cross the road, the attempt to cross could not be regarded as contributory negligence. Only reasonable care was required of him and upon the record we are unable to say that he failed to use that degree of care. To another question, whether with reasonable diligence Bagnall could have seen Hunt's car approaching him for a distance of at least 100 feet from the

point of collision, the jury answered, "No." It appears that the lamps on the car of deceased were lighted and could have been seen by the driver of an approaching car. Another thing, it does not appear that deceased knew the speed at which Hunt was traveling nor that the deceased knew that Hunt's car was coming at an excessive speed. He had a right to assume that the car would not be driven at an excessive speed or one which would prevent Hunt from stopping his car within the distance illuminated by the lights on it. (*Fisher v. O'Brien*, 99 Kan. 621, 162 Pac. 317.)

A finding that Bagnall was not guilty of negligence is questioned because it was a mere conclusion. The question, "Was Bagnall guilty of negligence which contributed to his injury?" was answered, "No." It appears to have been asked by the defendant in a form that invited a one-word answer and under the circumstances it is not open to the objection now made.

There is some complaint of instructions given, but they are not deemed to be meritorious, and finding no error in the record the judgment is affirmed.

BURCH, J., not sitting.