### No. 35,602

JACK BOECK, a Minor, by JOHN BOECK, His Father and Next Friend, *Appellee* and *Cross-appellant,* v. KATZ DRUG COMPANY and CHARLES M. BREIDENTHAL, *Appellants.*

(127 P. 2d 506)

Opinion filed July 11, 1942.

*A. J. Herrod,* of Kansas City, was on the briefs for the appellants.

*George E. Gard, Charles F. Williams* and *Frank L. Bates,* all of Kansas City, were on the briefs for the appellee.

The opinion of the court was delivered by

SMITH, J.: This is an action by a minor by his next friend to recover damages alleged to have been sustained when a prescription for eserine was filled by one of the defendants with atropine and the atropine was used in the minor's eyes according to the doctor's prescription. Judgment was for the plaintiff. Defendants appeal.

After setting out the address of the parties and the incorporation of one of the defendants and that Breidenthal was employed by the company, the petition alleged that on August 31, 1935, plaintiff received a prescription for "eserine ¼ of 1% Z 1/IV Sig.—one drop in each eye twice a week" from a doctor; that the prescription was filled by defendant on the same day; that Breidenthal, an employee of defendant drug company, with reckless disregard of his duty amounting to gross negligence, used the wrong ingredients to fill it; that within a short time Jack Boeck began to complain of sore eyes, headaches, dizziness, disordered stomach, and about the first week began to vomit; his eyes became weak; sometime about six weeks later he was forced to drop his music instruction; that about that time plaintiff learned that the bottle contained the wrong prescription; that as a direct result of the negligence of defendant the eyesight of Jack Boeck had been permanently rendered defective; that this negligence was gross and wanton.

The prayer was for $25,000 punitive damages and $25,000 actual damages.

The answer was a general denial and a plea of contributory negligence.

Jack's father testified about getting the prescription filled by defendant Breidenthal at a store operated by defendant Katz; that they used the prescription and after the second time he noticed Jack not walking like he should, and several times he ran into a chair; that Jack vomited all the time they were using the medicine; that before Jack started using the medicine he played like any boy would; was in Knapp's Rough Riders and drove a chariot and rode at night; that Jack started wearing glasses about fifteen months previous to August 31, 1935; that after about two weeks of using the medicine he noticed once when Jack started to open the car door he went to the rear of the car about six feet away from the door; that since using the medicine Jack has never ridden his pony; never driven his car; has not gone out alone at night; has not played with other children; that Jack was operating a ditto machine at the time of the trial; that he kept on giving the boy the medicine even though he said it hurt him and even though he vomited; gave it to him for six weeks; every time he was given the medicine it made him sick and he would vomit.

Another witness testified that Jack did not ride his pony after September, 1935.

The plaintiff testified that he was fourteen years old in August, 1935; at time of trial he was working for Dun and Bradstreet; that he only had to see in front of him to operate his machine; before taking this prescription he belonged to Knapp's Rough Riders, doing trick riding; after the second drop in his eyes he started getting sick at the stomach; every time he would eat something he could not hold it down; was nervous and had headaches; had none of these things before using the medicine; about two weeks after August 31, 1935, at nighttime he could not find anything when he went outside; at time of trial could not see to the right or left without turning his head; atropine in his eyes always made him sick.

There was further evidence as to Jack's activities before and after using the prescription.

For the plaintiff, Doctor Lidikay, after being qualified as an expert, testified that he examined Jack's eyes March 25, 1940; that he found him suffering from retinitis pigmentosa, that is, a degenerative condition of the margin of the retina; that this disease causes night blindness and is a progressive disease; that night blindness occurs sometimes from fasting. A hypothetical question covering the condition of the plaintiff was then propounded to the doctor and

he was asked whether he had an opinion that atropine had anything to do with the condition of Jack. The doctor's answer was "yes." The doctor testified that atropine would dilate the pupils and make them sensitive to light; that there were people who were sensitive to atropine and that headaches and nausea were symptoms; that there was no cure for the condition he found in Jack's eyes.

On cross-examination he testified that the use of atropine could not start retinitis pigmentosa. On redirect examination, when his attention was called to a textbook statement that during the last war numerous cases of night blindness were discovered in which the determining causes were great fatigue, loss of blood and refraction error, especially myopia and astigmatism, he stated that this was one of the authorities for his statement in answer to the hypothetical question, that it was a nutritional thing; that atropine could cause the condition described by causing a person to be sick and vomiting and lowering his vitality.

Jack's mother testified to about the same general effect as his father had.

The defendants demurred to the evidence of plaintiff on the ground that it did not show facts sufficient to constitute a cause of action. This demurrer was overruled. That ruling is the first error urged by defendants.

In the consideration of this question we must take the evidence of plaintiff as true and give the plaintiff the benefit of all reasonable inferences and presumptions to be drawn from the circumstances proved by him. The first argument of defendants is that the evidence wholly failed to prove that the use of the atropine caused the plaintiff's condition. At the outset, it should be noted that defendants concede that there was substantial evidence that defendant did put atropine in the prescription instead of eserine. It is conceded also that atropine dilates the pupils and eserine contracts them.

Defendants point out and rely on the testimony of plaintiff's doctor that the condition from which Jack was suffering could not have been caused by the use of atropine. The testimony of the doctor taken as a whole can hardly be given that construction. The plaintiff does not deny that he was suffering from retinitis pigmentosa at the time of trial. He argues, however, that there was substantial, competent evidence tending to show that the use of atropine caused the disease to develop much more rapidly than it would have

done otherwise. Such a question may be established by circumstantial, as well as by direct evidence. See *Railway Co. v. Colliati,* 75 Kan. 56, 88 Pac. 534; also *Bank v. Freeburg,* 84 Kan. 235, 114 Pac. 207; and *Betterment Co. v. Reeves,* 77 Kan. 111, 93 Pac. 627.

Doctor Lidikay did not examine Jack until almost four years after the prescription was used, but Jack's father and mother and playmates testified to the effect that his condition became worse right after the atropine was used and never did return to normal. The persuasive feature of the doctor's testimony was his answer to the hypothetical question to the effect that he had an opinion that the atropine had something to do with Jack's condition and his further testimony in view of the evidence about the atropine causing Jack to vomit every day for six weeks; that the night blindness was caused sometimes by malnutrition or lowering of vitality. It should be noted in this connection that the plaintiff did not base his right to recover in his petition on the fact that the use of the atropine caused him to have retinitis pigmentosa. He only pleaded that its use damaged his eyes. If the latent susceptibility to the disease was there when the atropine was used the defendants would be liable if their negligence damaged the eyesight of the plaintiff even though the damage was rendered worse or aggravated by the latent existence of the disease. The rule is stated in 22 R. C. L., p. 150, as follows:

"The general principle is that ill health and the various kinds of mental or physical disability which follow the negligent . . . infliction of a direct bodily injury are such natural and probable consequences of the injury as the tortfeasor must answer for."

See, also, *Jones v. City of Caldwell,* 20 Idaho 5, 116 Pac. 110.

Following the foregoing rule, we hold that the question of whether plaintiff was damaged by the negligence of defendants was a proper one to submit to the jury. The demurrer of defendants to the evidence of plaintiff was properly overruled.

Defendants next argue that the trial court erred in overruling their motion for a directed verdict in their favor. The same answer may be made to this argument that was made to their argument that the demurrer to the evidence of plaintiff should have been sustained.

Defendants next argue that the court erred in instructing the jury as follows:

"If you find from the preponderance of the evidence that the defendant Breidenthal acting in his capacity as clerk and pharmacist for the defendant, Katz Drug Company, was negligent in failing to fill or compound the prescrip-

tion of the physician in accordance with its contents and requirements, as written, so that in fact atropine was delivered to the plaintiff, instead of eserine, then such negligence of said Breidenthal is equally binding upon him and his employer, said Katz Drug Company."

Defendants argue that this amounts to an instruction that if·the jury found that atropine was delivered instead of eserine they should find for the plaintiff. The instruction does not say that. What the instruction intended to cover was the question of whether or not the Katz Drug Company was liable for the negligence of its employee, Breidenthal, and it stated the law correctly.

Defendants next argue that the court erred in refusing to give certain requested instructions. We have examined these instructions and also the instructions that were given. We have concluded that the subject of the requested instructions was covered very well in the instructions that were given and there was no error in refusing to give any of the requested instructions.

Defendants next argue that the court erred in refusing to set aside answers to certain questions. The first of these was question No. 4. Question No. 4 and answer are as follows:

"Could atropine cause or contribute to the disease called retinitis pigmentosa? A. Contribute."

The surrounding circumstances and expert evidence of Doctor Lidikay were substantial evidence to sustain the above answer.

Defendants argue that Doctor Lidikay testified that he had an opinion but that he was never asked to state what that opinion was. We think that this is not a correct interpretation of the answer. From examining the question and the colloquy that occurred before the doctor was permitted to answer the above, we have concluded that the fair interpretation is that the doctor testified that in his opinion the atropine did have something to do with the disease.

The next question which defendants argue should be set aside is question 9-a. That question and answer are as follows:

"Did the defendants deliver to the plaintiff or his father or mother two bottles of medicine, one on August 31, 1935, and another bottle on or about October 26, 1935? A. No."

We fail to see how this could have any effect on the outcome of the case, but there was evidence which warranted the jury in making the answer they did.

Defendants next argue that it was error not to set aside the answer to question 11a because it was not supported by the evidence. The question and answer are as follows:

"If you find that the plaintiff suffered any damage by reason of the use of the medicine or liquid sold by defendants on August 31, 1935, state (a) Was the use of the medicine the cause of the condition from which plaintiff is suffering? A. Yes."

As we have heretofore demonstrated in the case, there was substantial evidence to warrant the jury in making that finding.

The same is true of the argument of defendants with reference to the answer to question 11-c.

Defendants next argue the court erred in refusing to sustain their motion for judgment on the special findings. We have examined the argument with reference to this question. It appears that defendants argue that because the jury said in answer to question 3 that retinitis pigmentosa was a hereditary disease caused by a systemic condition and in answer to question 4 that atropine contributed to the disease the two answers were inconsistent. We have demonstrated in this opinion that there was evidence to the effect that the disease is systemic and that atropine used as this was could aggravate it.

Neither are we impressed with the argument of the defendants that it was contributory negligence on the part of this fifteen-year-old boy to keep on using this medicine because it made him sick. If he had confidence enough to go to the doctor and to ask him to prescribe we cannot say that it was contributory negligence for him to follow the directions as to his medicine even though it did nauseate him.

Defendants next argue that the trial court erred in instructing the jury on the question of punitive damages. In this connection they argue that punitive damages may not be awarded unless there is evidence of gross negligence. They argue that there was no such evidence in this case.

The rule is that in order to constitute wantonness the evidence must show a reckless disregard of the rights and safety of others. The evidence for plaintiff simply showed that Breidenthal filled the prescription with atropine instead of eserine. In order for us to say that there was evidence of plaintiff to warrant the giving of an instruction on wantonness and punitive damages we would be compelled to hold that where a druggist fills a prescription with the wrong drug he is guilty of wantonness as a matter of law. It is true, as plaintiff points out, that the druggist defendant here testified that he made four checks on this prescription when filling it. Plaintiff argues that

this evidence convicts the druggist of gross negligence. On the contrary, it seems to show an intention to guard against mistakes. In the cases cited by plaintiff where telegraph companies were held liable for punitive damages for failure to deliver messages the opinions state there was failure to exercise diligence in finding the person to whom a message was addressed as in transmitting the message. We do not find that situation here.

We do not find it necessary, however, to reverse the judgment of the trial court on that account. As we have heretofore demonstrated in this opinion, there was substantial evidence to warrant the jury in finding that the plaintiff had sustained some actual damages. The instruction we are considering related to the measure of damages only. The plaintiff does not complain of the instruction as to the actual damages. The only effect of this instruction was to cause the verdict to be for a larger amount than it would be otherwise. The jury in this action returned a verdict for $15,000. The jury was not asked to find how much of this was for punitive and how much for actual damages. The trial court found that the verdict as rendered by the jury was excessive in the amount of $7,500 because the nature and extent of disability was insufficient to support a verdict of $15,000, and gave the plaintiff five days within which to file his remittitur of the sum of $7,500 and ordered a new trial if this remittitur was not filed. The plaintiff did file this remittitur and judgment was for $7,500. The trial court further found that the verdict of the jury was not rendered with passion or prejudice.

We have the same question that this court had in *K. C. Ft. S. & G. Rld. Co. v. Kier,* 41 Kan. 671, 21 Pac. 770. In that case there had been an instruction on punitive damages and gross negligence when there was no evidence to justify it. This court said:

"We have concluded, considering the testimony and verdict, that as we cannot clearly decide that the erroneous instructions might not have increased or exaggerated the verdict, the judgment must be reversed unless Kier, within thirty days, remits $2,000 thereof. If this is done, the judgment of the district court will be affirmed for $5,000.

"We may fairly assume, upon the testimony and verdict, that the jury intended to embrace in the verdict the actual damages which Kier was entitled to recover. The erroneous instructions only related to the measure of damages; therefore, these instructions only affected the damages allowed. It is apparent from all the testimony that $5,000 will not exceed the actual damages suffered. If the verdict had been for $5,000, it would be clear beyond doubt

that the error alleged did not and could not have prejudiced the rights of the railroad company. (*Thomas v. Dansby,* 41 N. W. Rep. 1088.) While the damages found are not excessive, yet they are a full, round sum for the injuries complained of, and hence, on account of the error committed, the necessity of a modification of the judgment." (p. 672.)

To the same effect is the holding of this court in *Jackson v. Oil Co.,* 97 Kan. 674, 156 Pac. 756; also *Flynn v. Hollenback,* 103 Kan. 448, 173 Pac. 925.

In this case the defendants had an opportunity to have the jury find how much of the verdict was for actual and how much for punitive damages. They did not see fit to take advantage of this opportunity. The court found on its own initiative that the verdict was excessive in the amount of $7,500 because the nature and extent of disability was insufficient to support such a verdict. This is entitled to some weight on the question of whether there was evidence of sufficient disability to support a judgment for $7,500. Not every excessive verdict and judgment requires a new trial. Quite often the error can be cured in this court by ordering a remittitur or, in the alternative, a new trial. See *Leinbach v. Pickwick-Greyhound Lines,* 138 Kan. 50, 23 P. 2d 449; also *Hudson v. Yellow Cab & Baggage Co.,* 145 Kan. 66, 64 P. 2d 43, and many cases.

Following the practice in those cases and prompted to some extent by the action of the trial court in ordering the remittitur we have examined this entire record on the question of whether the final judgment was excessive. There is no exact yardstick to measure the extent to which a young boy is damaged when his eyesight is impaired. We have concluded, however, that the final judgment is not warranted by the evidence. It is excessive in the amount of $2,500. We are satisfied the jury placed too high a figure on the actual damages to plaintiff by $10,000. The trial court should have ordered a remittitur by that amount rather than $7,500.

If the plaintiff will remit $2,500 of this judgment and so advises the clerk of this court within ten days after the filing of this opinion the judgment of the court will be affirmed; otherwise it will be reversed for a new trial.