No. 20,162.

SAFEWAY STORES, INC., *v.* GEORGIA C. REES.

(381 P. [2d] 999)

Decided May 20, 1963. Rehearing denied June 10, 1963.

Messrs. WOOD, RIS and HAMES, Mr. STEPHEN E. CONNOR, for plaintiff in error.

Mr. GEORGE T. ASHEN, Mr. THOMAS C. SINGER, for defendant in error.

*In Department.*

Opinion by MR. JUSTICE HALL.

THE parties appear here in reverse order to their appearance in the trial court. We refer to them as Georgia and Safeway.

On February 10, 1960, Georgia filed her complaint in

the trial court alleging that on or about January 25, 1959, she purchased a package of cheese from Safeway; "that said cheese contained a foreign substance, namely, numerous small chunks of wire and was unfit for human consumption"; that she ate some of the cheese and as a result suffered damage to her intestinal tract; "that the foreign substance in said cheese caused plaintiff [Georgia] to develop hemorrhoids," requiring surgery, with attendant hospital and medical expense, "pain both of mind and body" and facing the future with predictable additional medical and hospital expenses. She demands damages in the amount of $51,609.10. (She makes no claim for temporary or permanent injuries.)

Safeway, for answer, filed a general denial.

Trial was to a jury which returned a verdict for Georgia in the amount of $5,293.86.

Safeway's consolidated motion for judgment notwithstanding the verdict and for new trial was denied and judgment entered on the verdict.

Safeway is here by writ of error seeking reversal, contending that the trial court erroneously denied Safeway's motions for a directed verdict because of Georgia's failure to prove the facts necessary to entitle her to recover. Also assigned as error is the ruling of the trial court in permitting counsel for Georgia to ask a hypothetical question and obtain an answer thereto when the question assumed facts of which there was no proof. This later assignment must stand or fall on resolution of the only real question involved, namely, Was the evidence sufficient to submit the matter to the jury?

The trial court instructed the jury:

"* * * before you may find that * * * Georgia C. Rees, is entitled to recover damages herein, you must find from a preponderance of the evidence that:

1. The plaintiff ate cheese with wire in it.

2. That any wire which the plaintiff ate was in the cheese at the time she purchased it from the defendant; and

3. That the alleged injuries and damages, if any, proximately resulted from eating cheese with wire in it.

"If any one of the three foregoing propositions has not been proven by a preponderance of the evidence, your verdict must then be against the plaintiff and in favor of the defendant."

The parties accept the foregoing instruction as a proper statement of the law governing the case.

Georgia claims that the evidence establishes each of the three essential facts necessary to justify a recovery by her of damages. Safeway contends that the evidence fails to establish any of the three facts necessary for a recovery.

This is the problem presented for our resolution.

We find no substantial conflict in the testimony. Disagreement arises out of the question as to what reasonable inferences may be drawn from the testimony as to certain facts.

Georgia's evidence was to the effect that she is forty-four years of age, the mother of two. That in September 1957 she had undergone an hemorrhoidectomy at the hands of Dr. Sawyer, at which time three internal and external masses were removed from the anal canal just inside the anus. Post operative treatment consisted of placing Georgia on a non-residue diet, prescribing a laxative and administering weekly digital dilations of the rectum until November 29, 1957, and thereafter bi-monthly or monthly dilations until February 5, 1958, and periodically thereafter until October 31, 1958. The purpose of the dilations was to prevent or minimize the "formation of contracturing or scar tissue."

The operation and treatment produced "a good result" with a "minimal amount" of scar tissue or scarring in the anal canal or the rectum or anus.

Dr. Sawyer hospitalized Georgia during the period September 19-22, 1958, "trying [without success] to find out what was wrong with her."

After October 31, 1958, Georgia continued on her diet and prescribed laxative.

On January 20, 1959, Georgia and her husband purchased at a Safeway store groceries for the family, including a one pound, eight ounce, cylindrical shaped cheese enclosed and sealed in a plastic covering. On arriving home the cheese was placed unopened in the family refrigerator and there remained for a day or two, after which Georgia opened the cheese and sliced some off. "Oh, I would say, three or—about three good slices of it" for the evening meal. She and her husband partook of the cheese, the children did not. In slicing the cheese and eating it neither Georgia nor her husband saw or felt any wire or noticed anything unusual. The uneaten portion of the cheese, a little more than one half, was put back in the refrigerator.

About three days after eating the cheese, Georgia, in having a bowel movement which she described as a firm stool, not loose, suffered what she described as a rectal hemorrhage, bleeding and severe pain.

She saw Dr. Sawyer some five days later, and on February 23, 1959, again underwent surgery for an anal fissure and enlarged papillae in the anal canal. Preceding this second operation, Georgia gave to Dr. Sawyer a history of "bleeding, soreness, constipation."

Subsequent to cutting and eating of part of the cheese about January 22, 1959, the uneaten portion had remained in the refrigerator untouched.

On March 1, 1959, following this second operation Georgia returned home. She testified that shortly after her return she removed the uneaten portion of the cheese from the refrigerator and proceeded to slice some for the evening meal. As she was cutting the first slice the knife struck some fine wire in the cheese. She cut off the slice and threw it away and she and her husband both saw (so they say) numerous pieces of fine wire in the remaining portion of the cheese. They did not eat any of the cheese at that time, but put it back in the re-

frigerator and shortly thereafter notified Safeway of the wire in the cheese. Safeway's manager examined the cheese and admitted there was then some wire in the cheese.

Dr. Sawyer testified that results of the February 23, 1959, operation were good and Georgia's convalescence normal, but that she, following this operation, complained to him of discomfort.

On August 28, 1959, Georgia told Dr. Sawyer that in January 1959 she had eaten cheese with wire in it. In October 1959 she showed the uneaten portion of the cheese to Dr. Sawyer. He saw some wire in the cheese.

Dr. Sawyer could not find any cause for Georgia's discomfort until October 2, 1959, when one of his associates found another fissure and more inflammation of the papillae for which she was again operated in January 1960 with good results.

Following this operation she had a rectal hemorrhage in March 1961, and another on the eve of the trial, September 19, 1961.

There is no direct testimony in the record that Georgia ate any wire; the record is clear that she had no knowledge of the presence of any wire in any of the cheese prior to March 1, 1959, some thirty-five days after the eating of cheese at the evening meal, the only time cheese was eaten. No wire was ever found in her body or excrements therefrom. Georgia's husband witnessed the cutting of the cheese; he saw no wire; he detected no wire in eating the cheese and suffered no ill effects from eating the cheese. There is no testimony or intimation that the wire in the cheese, if any, contaminated or rendered the cheese unsuitable for human consumption; the only harm that could occur to the body by reason of eating the cheese with the wire would be mechanical, such as injury to the teeth in biting a hard substance or a tearing or scratching of some of the tissues or membranes of the tracts through which it passed.

Medical testimony offered in behalf of Georgia was to

the effect that cause for Georgia's condition at the time of the 1957 operation was never determined.

"Q. Doctor, did you determine the cause of the hemorrhoids in 1957 in Mrs. Rees? A. No, I didn't."

Similar testimony was offered with respect to the cause of her condition which prompted the February 23, 1959, operation.

"Q. * * * had you found anything from an ideological standpoint or a cause standpoint as to the cause of this particular hemorrhoid or fissure situation that you found on your examination? [preceding the February 23, 1959, operation]. * * * A. No."

The question as to what caused the conditions which prompted a third operation in January 1960 has not been resolved by Dr. Sawyer.

"Q. (By Mr. Ris) So then she had another fissure and also papillitis, infection of the papilla, in October, 1959? A. That's right. Q. And with no apparent cause other than just the general nature of her body? A. That's right. Q. Unfortunately, with some patients this does continue to recur over a period of time without any known cause, does it, doctor? A. Yes, sir. Q. And that is particularly true after an original hemorrhoidectomy, is it not? A. Yes, sir. Q. Would that have any relation, doctor, to the scar tissue remaining after the first operation for the removal of the hemorrhoid? That scar tissue is more vulnerable to infection than the surrounding tissue? A. Yes. Q. And it would also be true that the area of the scar tissue in the original hemorrhoidectomy would be more prone to be the site of infection from, say, the passage of a hard stool? A. Yes, that's right. Q. Mr. Rees is—has testified already in this case that she continues to have trouble up to this time with her rectal anal area. Is she still under your care for that? A. Yes. I see Mrs. Rees periodically. I saw her in August, July, two times in June, in May, '61, April. Q. So she continues to have other problems in the same area; is that true? A. Yes. Q. And for which you do not know

the cause, unfortunately? A. No, you can't—it looks perfectly normal. Q. It looks perfectly normal to you on examination? A. Yes, except for maybe minimal scarring. Q. Except for the minimal scarring? A. Yes. Q. There's nothing that, from your examination you would say is wrong with her; is that correct? A. That's right."

Dr. Sawyer further testified:

"Q. What were the underlying conditions that kept her on that diet, then, for that entire period, some fifteen months? A. Well, I'll tell you, she's a tense individual who's prone to have—might have a lot of difficulty with constipation and trouble with her colon. That type of person does better on a low residue, non-irritating diet. Q. By that, do I understand that she's the type of person who would be rather prone to the type of difficulties that have been described here? A. Well, I think so."

\*     \*     \*

"Q. Is it not true, doctor, that in cases of rectal difficulties that a large stool, bowel movement, can be of such a nature as to constitute trauma to the tissues in the anal canal? A. That's right."

\*     \*     \*

"Q. And on the other hand, doctor, is it not true that diarrhea and the effect that it has on the tissue in the anal canal can also be a predisposing cause? A. That's right."

Further medical testimony indicated that one may have hemorrhoids, fissures, enlarged and infected papillae without any trauma, such as scratches, or lacerations, and that one may have lacerations in the anal canal without hemorrhoids, fissures or enlarged papillae.

Over objection of defendant's counsel, Dr. Sawyer was permitted to express an opinion as to whether there was a causal connection between the fact that Georgia had eaten wire about January 25th and the condition found in her anus and rectum at the time he operated on her February 23, 1959.

His opinion was to the effect that it is probable that the fissure was caused from the wire. This opinion was immediately followed by a statement *that he had no opinion* as to the cause of the fissure for which he operated in 1960.

"Q. * * * Could that fissure have been caused by just one hard enlarged stool? A. Oh, yes."

Safeway offered testimony which cast grave doubt as to whether there was any wire in the cheese at the time of its purchase, also very credible medical testimony to the effect that the ingestion and passage of hard, sharp objects such as fish bones, chicken bones, popcorn, seeds and other materials, even wire of the kind described, are not the cause of fissures or conditions for which Georgia was operated. We need not and do not determine the sufficiency of the evidence to sustain a finding that wire was in the cheese when purchased. We do conclude that Georgia has failed to prove that she ever ate any wire or that, if she did eat wire, the eating thereof had anything to do with conditions of which she complains.

Georgia starts with the premise that the uneaten one-half of a twenty-four ounce cheese contained some fine wire, and from there she surmises the eaten portion must have contained wire and that she, having partaken of the cheese, ingested some of the wire. This, mere conjecture, does not rise to the dignity of proof and is not sufficient to establish the fact alleged and necessary to be proved.

From the record it clearly appears that Georgia had no knowledge or even suspicion of any wire in the cheese until some five weeks after the eating thereof. After having found that the uneaten cheese contained wire, she, though seeing her doctor regularly, waited for five months before making known to him her suspicions that she might have eaten some wire, and when she told him of the wire, she, according to the doctor, told him

that she had eaten some of the wire, something that she never told the jury.

X-ray photographs of the uneaten portion of the cheese show only one small piece of wire imbedded in the cheese, located near the perimeter thereof.

Even though there may have been more than one piece of wire in the uneaten half of the cheese, that fact would not constitute evidence of the existence of wire in the other half of the cheese, and would not constitute evidence that there was wire in the small portion of the cheese eaten by Georgia. And even that fact, if established, would not constitute evidence that the wire, if so eaten, caused her rectal troubles.

Here, neither Georgia, her husband, nor her doctor would testify that she ate any wire. And yet the jury was permitted to guess.

Her doctor did not know the cause of her condition prompting the 1957 operation. He hospitalized her in 1958—"trying to find out what was wrong with her." He did not determine the cause of her condition which prompted the 1959 operation except that she complained of constipation, one of the causes of rectal troubles. He did not find any apparent cause for her 1960 operation for rectal troubles other than the general nature of her body. He did know that Georgia is:

"* * * a tense individual * * * prone to have * * * constipation and trouble with her colon * * * the type of person who would be rather prone to the type of difficulties that have been described here."

He did know that any of the three rectal operations performed on Georgia could have been caused by a hard stool or a large fecal impaction or a foreign body (such as wire) or direct trauma or "by just one hard enlarged stool."

█ We conclude as a matter of law that the evidence, considered in the light most favorable to Georgia, fails to establish that Georgia ate any wire, or that her rectal

conditions were proximately caused by the ingesting of wire. The evidence presented does not rise above the dignity of surmise, conjecture and speculation and does not support the verdict or judgment.

The following language, found in *Mosko v. Walton*, 144 Colo. 602, 358 P. (2d) 49, is particularly applicable to the situation here presented:

"* * * While we agree that the state of the record is sufficient to establish a possible connection between the leaking pipeline and the damage to plaintiffs' building, we cannot affirm a judgment based upon mere possibilities, conjecture or speculation.

* * *

"Viewing the state of the record as a whole in the light most favorable to plaintiffs, we must hold that the evidence of negligence of all or any one of defendants being the proximate cause of the damages is insufficient to remove it from the field of conjecture and speculation so as to provide a basis upon which inferences might reasonably be drawn. 'There must at least be sufficient evidence to remove the question from the realm of conjecture.' *Polz v. Donnelly* (1949), 121 Colo. 95, 98, 213 P. (2d) 385.

* * *

"* * * The rule of proximate cause requires proof that but for the defendants' negligence the damage would not have occurred. *Stout v. Denver Park and Amusement Co.* (1930), 87 Colo. 294, 287 Pac. 650. Where the evidence, as here, presents no more than an equal choice of probabilities, it is not substantial. *Polz*, supra. 'No number of mere possibilities will establish a probability.' *U.S.F. & G. Co. v. Ind. Com.* (1950), 122 Colo. 31, 219 P. (2d) 315.

"And where, as here, defendants show that it is as likely that the injury occurred from one cause as another, and that the defendants are not responsible for one cause, the burden of establishing proximate cause has not been fulfilled. See 65 C.J.S. 1195, Sec. 265."

In *Polz v. Donnelly*, 121 Colo. 95, 213 P. (2d) 385, in setting aside a jury verdict and directing dismissal of the claim because of lack of proof of an essential element, this court said:

"Placing the most favorable construction on defendant's evidence, it can not be said to establish more than that there was a possibility that the bulkhead was cracked at the time of the sale. This is not sufficient to prove a case. In *Creamery Package Mfg. Co. v. Industrial Commision*, 211 Wis. 326, 248 N.W. 140, the court said: 'Mere possibilities leave the solution of an issue of fact in the field of conjecture and speculation to such an extent as to afford no basis for inferences to a reasonable certainty, and in the absence of at least such inferences there is no sufficient basis for a finding of fact. * * * There must at least be sufficient evidence to remove the question from the realm of conjecture. *Lezala v. Jazek*, 170 Wis. 532, 536, 175 N.W. 87, 89, 176 N.W. 238.' For cases in this jurisdiction bearing on the point see, *Globe Indemnity Co. v. Stenger*, 82 Colo. 47, 256 Pac. 658; *McNulty v. Durham*, 63 Colo. 354, 167 Pac. 773. In *Reese v. Smith*, 9 Cal. (2d) 324, 70 P. (2d) 933, the court used the following language: 'If the existence of an esesntial fact upon which a party relies is left in doubt or uncertainty, the party upon whom the burden rests to establish that fact should suffer, and not his adversary. (*Patterson v. San Francisco, etc., Ry. Co.*, 147 Cal. 178, [81 Pac. 531]). A judgment cannot be based on guesses or conjectures. (*Puckhaber v. Southern Pac. Co.*, 132 Cal. 363 [64 Pac. 480]).'

\* \* \*

" * * * It is not sufficient to show a set of circumstances bringing the theory of appellants within the realm of possibilities, nor can the theory itself furnish the deficiency; the evidence must bring the theory to the level and dignity of a probable cause. * * * ."

Counsel for Georgia refer us to numerous cases, contending that they are authority justifying a conclusion

in this case that Georgia "ingested wire along with the cheese she ate."

A careful reading of the cases cited does not lead us to such a conclusion for the reason that in each case referred to the injured person had knowledge of the foreign substance at the time it was taken into the mouth.

Heavily relied upon by counsel is *Swengel v. F. & E. Wholesale Grocery Co.,* 147 Kan. 555, 77 P. (2d) 930. In that case plaintiff drank kraut juice. There was positive testimony that the juice she drank was impregnated with visible particles or flakes of foreign matter described as tin or metal of some kind, and that it had a terrible odor. Illness followed and medical testimony was to the effect that she was suffering from food poisoning. There plaintiff saw the foreign particles, she drank of the liquid containing the particles, she detected the bad odor. We find no similarity between this case and the case at bar.

Also relied upon by counsel is *Dryden v. Continental Baking Co.,* 11 Cal. (2d) 33, 77 P. (2d) 833. In that case plaintiff for the evening meal ate bread from a loaf of wrapped, sliced rye bread. In the eating she detected that it contained a gritty substance. The next morning more slices were toasted and eaten by plaintiff and her husband, both of whom in the eating detected some gritty substance. The gritty substance proved to be glass. Very different from our situation where Georgia did not discover the wire in cutting the cheese, did not discover wire in chewing, masticating, swallowing, or in the passage of the same through her body, and this coupled with the fact that her husband also ate cheese and suffered no ill effects. If we may assume that Georgia ate wire with equal propriety we should assume that her husband also ate wire, and if we go further and assume that the wire was the cause of Georgia's problem, with equal force we should assume that her husband is similarly afflicted.

In *McKittrick v. Dugan Bros. of New Jersey,* 119 N. J. L. 605, 197 Atl. 905, the plaintiff not only took the glass in her mouth, she discovered it by biting it and removed it from her mouth.

In *Collins Baking Co. v. Savage,* 227 Ala. 408, 150 So. 336, there was no question that plaintiff ate wire contained in the bread. The question resolved in that case was that the bread, when eaten, was in the same condition, insofar as it contained wire, as when purchased.

In *Gross v. Loft, Inc.,* 121 Conn. 394, 185 Atl. 80, there was proof that the chocolate bar eaten contained a pin. Nothing was left to surmise; the pin stuck in plaintiff's tongue.

In *Flynn v. First Nat. Stores, Inc.,* 296 Mass. 521, 6 N. E. (2d) 814, there was direct testimony that plaintiff did ingest the wire.

In *Miller v. National Bread Co.,* 247 App. Div. 88, 286 N. Y. S. 908, four slices of bread had been eaten from a loaf on Friday evening; the record does not disclose whether the person eating the bread at that time detected any foreign substance. On Saturday morning more slices were toasted and eaten, and it was then discovered that "strands of iron ran through the entire portion of the loaf remaining after four slices had been eaten."

Safeway's motion for a directed verdict and its motion for judgment notwithstanding the verdict should have been sustained.

The judgment is reversed and the cause remanded with directions to dismiss the complaint.

MR. JUSTICE SUTTON and MR. JUSTICE MCWILLIAMS concur.