[Civ. No. 22286.   First Dist., Div. Two.   July 19, 1965.]

MARGARET J. THOMSEN, Plaintiff and Respondent, v. REXALL DRUG AND CHEMICAL COMPANY et al., Defendants and Appellants.

Mullally & McCorkindale, Chris Gasparich and Lawrence E. Mullally for Defendants and Appellants.

Bernard Allard and Jeremiah F. O'Neill, Jr., for Plaintiff and Respondent.

BRAY, J.*—Defendants, Rexall Drug and Chemical Company, and J. Mock, appeal from judgment after jury trial in favor of plaintiff in the sum of $75,000,[1] the orders denying motion for nonsuit, motion for judgment notwithstanding the verdict, and motion for new trial.[2]

---

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1] In the original complaint, the defendants were Drug King, Owl Drug Co., Rexall Stores, Inc., Fred Guaglianone and J. Mock. By amendment, these defendants, other than Mock, were eliminated and the action proceeded against him and Rexall Drug and Chemical Co., hereafter referred to as Rexall.

[2] The orders denying motion for nonsuit and motion for new trial, although reviewable on this appeal from the judgment, are not appealable and the appeals therefrom must be dismissed (*Torres v. City of Los Angeles* (1962) 58 Cal.2d 35, 55 [22 Cal.Rptr. 866, 372 P.2d 906].) The order denying motion for judgment notwithstanding the verdict is appealable (Code Civ. Proc., § 629).

## QUESTION PRESENTED

Solely, the sufficiency of the evidence.

## RECORD

The complaint charged negligence and breach of warranty in the filling of a certain prescription by defendants. A jury brought in a verdict in favor of plaintiff for $75,000 as damages for plaintiff's injuries resulting from her taking an erroneous prescription. Judgment was entered accordingly.

## EVIDENCE

On this appeal, defendants do not attack the implied findings of negligence and breach of warranty but contend that there is insufficient evidence to show that plaintiff's condition was proximately caused by her ingestion of the erroneously refilled prescription rather than by her preexisting illnesses or the effects of cortisone.

In the fall of 1960, plaintiff was 41 years old, married and had three children. About 15 years earlier, she began to suffer from rheumatoid arthritis, chiefly in the joints of her fingers, wrists and knees. She was placed on a steroid treatment and given cortisone drugs to alleviate the symptoms of the disease. Despite numerous flareups and remissions in her arthritic condition, she was able to take care of her family and to continue working as a waitress, earning about $90 a week. In 1956, she came under the care of Dr. Norman who prescribed many varieties of cortisone but usually returned to a type known as ataraxoid. Before seeing Dr. Norman, plaintiff had at times taken as many as seven cortisone pills a day in order to relieve her arthritic pains. Dr. Norman, however, reduced her dosage to three pills a day which was sufficient to enable her to take care of her family and to continue in her employment.

In the fall of 1960, plaintiff developed difficulty in disposing of the fluids in her body, a common symptom in patients on steroid therapy, i.e., taking cortisone type drugs. To correct this condition, Dr. Norman on September 19, 1960, prescribed a diuretic drug, with a brand name of "hydrodiuril." On September 20, plaintiff had the original hydrodiuril prescription filled at defendant's Drug King store on East 18th Street in Oakland across the street from her place of employment. She received a bottle containing a number of small pink pills.

On November 11, 1960, she returned for a refill of the hydrodiuril and was waited on by Mock, admittedly a reg-

istered pharmacist in Rexall's employ. Plaintiff noticed that Mock gave her some large yellow or white pills completely different from the small pink ones she had received before. After being assured by Mock that the white or yellow pills were her hydrodiuril prescription, plaintiff procceded to take two pills a day in accordance with her doctor's orders, together with her three daily pills of ataraxoid. In the latter part of November and early in December, plaintiff experienced symptoms completely different from anything she had ever felt before—an unusual muscular tiredness and weakness and a sensation of numbness in her legs.

On December 17, 1960, plaintiff returned to the defendant's drug store for another refill of the hydrodiuril drug and the prescription was checked by another pharmacist named Farrin who informed plaintiff that the yellow or white pills were not her prescription and not to take any more of them. She returned the bottle containing some of the pills and no one ever saw them again. Farrin removed the large white or yellow pills from the bottle, changed the number on the label, and refilled it with the small pink pills that were like the original hydrodiuril pills.

In the latter part of December, plaintiff's condition became worse. The tiredness, weakness and numbness continued until she was unable to work and became bedridden. On January 6, 1961, plaintiff went to Dr. Norman's office and told the nurse she was feeling weak and thought she had the flu. Plaintiff's condition was preliminarily diagnosed as cortisone toxicity and she was immediately sent to St. Mary's Hospital in San Francisco.

She remained there for one month until her transfer to the University of California Hospital. By this time, her muscular weakness, etc. had increased so that she could no longer move her arms or legs. After her release from the University of California Hospital, she was still crippled and confined to a wheelchair. Continuing physical therapy provided a slight improvement in her condition, but she is permanently confined to a wheelchair, unable to care for herself or her family.

While plaintiff was in St. Mary's Hospital, extensive tests, etc. were carried on to determine the cause of her condition. Finally, a diagnosis of three separate but simultaneously existing diseases was made, two of them obvious and existing long before her admission to the hospital: (1) her rheumatoid arthritis; (2) a condition called Cushing's Syndrome,

which is a recognized reaction to the cortisone drugs which she had been taking for many years (as indicated above, plaintiff contracted arthritis about 1945; she already exhibited some of the symptoms of Cushing's Syndrome when she first saw Dr. Norman in 1956); and (3) vasculitis,[3] the disease which is the crux of this controversy.

Vasculitis, briefly, is an inflammation of the small blood vessels which causes them to swell so that the blood vessels are blocked and the area they supply is, therefore deprived of circulation. The symptoms of vasculitis are profound changes in the nerves supplied by the inflamed blood vessels, especially those going to the extremities, and weakness and loss of sensation in those areas supplied by the nerves supplied by the inflamed blood vessels, as well as by areas of skin destruction and gangrene. The disease is a rare one and there are several distinct types. The exact cause of vasculitis is unknown but is thought to be related to an allergic reaction of some kind. Some types of vasculitis develop as a complication of arthritis; others can be caused by certain drugs, including sulfa drugs as well as streptomycin, chloromycetin and penicillin, and there has been a statistically high frequency of some types in persons on steroid therapy.

At the University of California Hospital, where plaintiff remained for a month after transfer from St. Mary's Hospital, the previous diagnosis of three simultaneous conditions superimposed on each other was confirmed. Further courses of diagnosis and treatment were undertaken. A biopsy indicated acute inflammation of the blood vessels (vasculitis) and an inflammation of the muscles (myositis); there were also indications of central nervous system changes with some reflex disturbances.

The defendants' medical experts agreed with the above mentioned diagnosis of plaintiff's condition as well as the nature and causes of vasculitis. The controversy centers on the varying opinions of the expert medical witnesses as to the particular type of vasculitis suffered by plaintiff and whether it could have been caused by the unknown drug that she took for a number of weeks after her prescription had been erroneously refilled.

---

[3] Although also referred to as arteritis or periarteritis, or periarteritis nodosa by the medical experts and hospital records, the term ''vasculitis'' will be used hereafter, as the medical experts indicated that the terms were almost synonymous and vasculitis was the preferable more inclusive term.

Plaintiff's expert, Dr. Tufft, testified that her vasculitis was the main problem despite the two other simultaneous conditions. He reached this conclusion because it was obvious from plaintiff's prior history that her arthritis had been controlled since she had been able to function for so many years. He did not think that plaintiff was suffering from the malignant phase of arthritis or the type of vasculitis associated therewith because the malignant form of arthritis usually resulted in death and the very fact that plaintiff was alive excluded diagnosis of the malignant phase of arthritis.

He further testified that vasculitis had an incubation period so that it would take a period of several weeks after the unknown drug was taken before the symptoms would begin to manifest themselves. He testified that it was in the nature of this kind of disease to circulate in the blood stream for a period of three to four weeks and that the inflammatory reaction would result and reach its peak within that time and then subside if the causative substance was eliminated.

Dr. Tufft further testified that he had eliminated plaintiff's Cushing's Syndrome (or cortisone poisoning) as a factor in causing the vasculitis, for several reasons. First, he thought plaintiff was suffering from a self-limiting type of vasculitis, that is, one that would burn itself out in a period of six-eight weeks. Second, while there was some opinion expressed by defendants' experts which implicated vasculitis and cortisone, the handicap of this thing was that vasculitis was not peculiar to arthritis, as vasculitis had existed long before cortisone and had been seen experimentally in patients who had never used cortisone. Furthermore, cortisone was also used to suppress vasculitis where it was known that the vasculitis was self-limiting. This use of cortisone itself in the treatment of some types of vasculitis could cause a problem because it often "masked" the development of the disease.

Dr. Tufft did not agree with the opinion of those doctors who thought that cortisone necessarily contributed to the development of vasculitis. He knew that several other types of drugs, including penicillin and sulfa drugs (both of which commonly come in large white pill form) had also been implicated as causes of vasculitis.

In response to a hypothetical question setting forth the facts of the instant case, Dr. Tufft stated that the erroneously filled prescription would be the primary suspect as the cause of plaintiff's vasculitis. He concluded that plaintiff was suffering from an acute type of hypersensitivity or al-

lergic vasculitis, caused by the reaction of her system to the erroneously refilled prescription and that this vasculitis was the cause of her nervous system disorders and crippled condition. He based this conclusion on several matters: first, plaintiff's history which indicated a hypersensitive and allergic type of individual; second, the self-limiting nature of the vasculitis she suffered [he noted that after she entered the University of California Hospital, she was maintained on a gradual reduction of cortisone, but at the same time, there was no change in the vasculitis as that had probably reached its climax and had already started to subside at the time of her transfer from St. Mary's Hospital]; and third, plaintiff's skin ulcers, nerve disorders and other symptoms were consistent with the allergy type of vasculitis.

Defendants' medical expert, Dr. Pruett, who examined and treated plaintiff at St. Mary's Hospital, indicated that her condition was initially diagnosed as rheumatoid arthritis complicated by taking an excessive amount of cortisone derivatives; after she had been at the hospital for about 10 days, it was recognized she had developed an additional complication, vasculitis. In treating the vasculitis, the cortisone was gradually withdrawn and the vasculitis was arrested. Like Dr. Tufft, Dr. Pruett indicated that under the present state of medical knowledge, the cause of plaintiff's type of vasculitis was unknown; that the disease was rare but that a number of the reported cases had involved the appearance of vasculitis where cortisone therapy had been applied to arthritic patients; that on this basis, many medical experts were of the opinion that cortisone may trigger the vasculitis in certain cases of arthritis. Dr. Pruett, however, felt there was only sufficient evidence to have a strong suspicion about the relation of cortisone and vasculitis, since many people got vasculitis without any cortisone treatment or ingestion.

He agreed that in plaintiff's case, the vasculitis had burned itself out so that there was no further progression of her nervous system damage and skin ulcers. He confirmed plaintiff's hypersensitivity to drugs and that she could react violently to any type of drug; that arteritis could be caused by certain drugs including sulphonamides and that where arteritis is caused by the ingestion of a drug, the reaction could take several weeks. In Dr. Pruett's opinion, plaintiff's type of vasculitis was merely a complication of the malignant phase of her arthritis which had become quiescent. He also

concluded that her vasculitis was a causative factor in killing the nerves and damaging the muscles that caused her crippled condition and that if she had never had vasculitis, her arthritis would not be so acute.

Dr. Norman, who treated plaintiff from November 1956 until shortly before her hospitalization in January 1961, testified that he had left the country in November 1960 and returned in February 1961 to find plaintiff at St. Mary's. He examined her at that time and recommended an immediate reduction of the cortisone drugs as he diagnosed her condition as the very rare type of vasculitis caused by her admitted excessive ingestion of cortisone and a continuing rather than a self-limiting condition. Dr. Norman confirmed plaintiff's allergic reactions and that drugs other than cortisone had been known to cause vasculitis.

The third of defendants' medical experts, Dr. Lewis, examined her in March 1962 and gave a description of her medical history and condition in substantial agreement with that of the other doctors. He likewise indicated that medicine had not been able to isolate the basic cause of the type of vasculitis suffered by plaintiff, but stated that the modern thinking on the general subject of disorders involving blood vessels was that they result from hypersensitivity to something manufactured in the body after exposure to something else such as some drugs or other unknown agents. Dr. Lewis identified eight types of vasculitis, five general kinds, and three localized ones.

He concluded that plaintiff was suffering from the very rare kind of general necrotizing vasculitis that results in nerve diseases, a type that had, on a statistical basis, been closely associated with arthritis connected with cortisone therapy. He thought that plaintiff's severe vasculitis and neural disorder were more closely associated with her underlying arthritis. He disagreed with Dr. Tufft's conclusion that plaintiff was suffering from the more common hypersensitivity or allergy type vasculitis, and did not think that her condition could have been caused by some kind of allergic reaction to an erroneously prescribed drug. Dr. Lewis also stated that no drugs other than steroids had ever been implicated in the type of vasculitis that he concluded plaintiff had, but since this type of vasculitis also occurred in people who were not on steroid therapy, he felt the steroid drugs were merely a contributory factor.

Defendants contend first that plaintiff has failed to estab-

lish a cause in fact, that is, one but for whose action or omission the injury would not have been sustained. Although this so-called "but for the" rule has recently been affirmed in this state (*Arthur* v. *Santa Monica Dairy Co.* (1960) 183 Cal.App.2d 483 [6 Cal.Rptr. 808]), it is well recognized that the rule serves to explain the greater number of cases but fails in the type of situation where several causes concur to bring about an event and either one of them operating alone would have been sufficient to cause the result (Prosser, *Proximate Cause in California*, 38 Cal.L.Rev., 369, 375-377).

This case appears to fall into that category since apparently plaintiff's vasculitis could have been caused by the cortisone or as well, the ingestion of the erroneous prescription. In such situations, it is recognized that neither cause can be absolved from responsibility on the ground that the identical harm would have occurred without it. The proper rule for such situations is that the defendants' conduct is a cause of the event as it is a material element and a substantial factor in bringing it about (Prosser on Torts (3d ed. 1964) ch. 7, pp. 243-244; Rest., Torts, §§ 431-433, and 1948 Supp., § 433; *Gall* v. *Union Ice Co.* (1951) 108 Cal.App.2d 303 [239 P.2d 48]). Whether it was such a substantial factor is for the jury to determine unless the issue is so clear that reasonable men could not differ. In the instant case, it is clear that the medical experts differed as to the nature and cause of the unusual disease which caused plaintiff's condition.

Defendants' second and main argument is that the evidence on proximate cause is insufficient, as the testimony of plaintiff's only medical expert, Dr. Tufft, is too vague and uncertain to establish the erroneous prescription as the cause of her condition, and that his testimony was a mere speculation as to probabilities without any factual basis in the evidence.

As indicated above, all of the medical experts agreed as to plaintiff's history and medical condition and admitted that the cause of the rare type of vasculitis suffered by her was unknown. They differed only in their interpretation as to what particular type of vasculitis she suffered and to what extent it was caused by her preexisting arthritis and the cortisone therapy or could have been caused by the ingestion of the erroneously refilled prescription. Admittedly, the

quantity and composition of the erroneous prescription was not known. It was established, however, that plaintiff's hydrodiuril prescription called for one-two pills a day and that the erroneous refill was made on November 11, 1960, and the unused portion returned about December 17, 1960. The expert witnesses agreed that a period of several weeks could elapse between the appearance of vasculitis and its cause. Admittedly, none of the hospital records or histories make any reference to the ingestion of the erroneously refilled prescription, although plaintiff stated that she had mentioned the matter to a number of doctors, including Dr. Pruett.

Plaintiff testified that the pills she received on November 11, 1960, were large yellow or white pills. There was evidence that both penicillin and certain sulfa drugs commonly came in such form and that these drugs had also been connected with causing vasculitis. Thus, there was sufficient evidence from which the jury could conclude that defendants had erroneously refilled plaintiff's hydrodiuril prescription with one of these drugs on November 11, 1960.

Defendants chiefly argue that Dr. Tufft's testimony, at most, shows a mere possibility of causation; that this is not enough since the matter remains one of pure speculation or conjecture. Defendants cite *Rexall Drug Co.* v. *Nihill* (9th Cir. 1960) 276 F.2d 637, wherein the plaintiff sued the manufacturer and seller of a home permanent for negligence and breach of warranty. The facts showed that shortly after the plaintiff applied the cold wave permanent, her hair fell out. The plaintiff's expert witnesses stated that they believed that a cold wave permanent could have caused the original loss of hair. The appellate court reversed the judgment in favor of the plaintiff, indicating that they were unable to discover any facts in the record from which the jury could reasonably infer that the home permanent solution was the proximate cause of the plaintiff's condition. The court said that under the particular circumstances, the temporal sequence of events was not sufficient to justify the inference of causation as the opinions expressed by the plaintiff's medical witnesses were not in the realm of possibility and probability. Defendants' argument is based on Dr. Tufft's testimony on direct examination that he believed the unknown drug to be a prime suspect and ignores his express statements on causation made on cross-examination.

Defendants cite *Safeway Stores, Inc.* v. *Rees*, 152 Colo. 318 [381 P.2d 999], and *Reese* v. *Smith* (1937) 9 Cal.2d 324

[70 P.2d 933]. In the *Safeway Stores* case, the plaintiff purchased some cheese at the defendant's store and shortly after eating the same developed further complications in a preexisting rectal disorder. After developing the aggravated condition, the plaintiff mentioned for the first time that she had eaten some wire contained in the cheese and the plaintiff's doctor indicated that the wire could have caused the injury. The judgment for the plaintiff was reversed, as the appellate court held that the evidence on causation was pure conjecture.

In *Reese, supra,* the plaintiff purchased some link sausage at the defendant's place of business, took it home, ate part of it and placed the remainder in her ice box. Within a few minutes, she noticed a sudden pain and was taken ill. One of the neighbors who immediately arrived to offer assistance inspected the remainder of the meat in the ice box and observed maggots in the open end of one of the sausages. At the trial, the plaintiff called a physician who testified that he diagnosed her illness as botulism and that in his opinion, it was caused from eating the sausage. The defendant introduced testimony showing that his shop was in a clean and sanitary condition, that the remainder of the sausage in his market had been inspected the day after the plaintiff had been taken ill at which time no maggots were found. He also introduced expert evidence that botulism could not flourish in the open sausage and that the appearance of maggots is not necessarily evidence of contamination. The judgment for the plaintiff was reversed on the ground that, considering all of the evidence in the case, the inference drawn by the plaintiff's physician that the meat was decomposed the previous evening because of the presence of the maggots and, therefore, caused the plaintiff's illness was not reasonable.

In *Vaccarezza* v. *Sanguinetti* (1945) 71 Cal.App.2d 687 [163 P.2d 470], in affirming a judgment for the plaintiffs (who had contracted trichinosis from sausages sold by the defendants) in an action based like this one on breach of implied warranty, this court distinguished *Reese* v. *Smith* as follows: "*Reese* v. *Smith,* 9 Cal.2d 324 [70 P.2d 933], and similar cases cited by defendants, do not establish a different rule. Those cases simply hold that inferences may not be predicated upon mere conjecture, a correct rule of evidence, and that inferences based upon facts disproved by common knowledge, are unsupported by the evidence. The plaintiff

relying on circumstantial evidence does not have to preclude the possibility of all other possible inferences. He simply has to establish the reasonableness of his inference by a preponderance of the evidence.'' (P. 692.)

''. . . *Reese* v. *Smith,* 9 Cal.2d 324 [70 P.2d 933] did not hold, as defendants apparently contend, that a doctor's testimony as to the nature and cause of a disease is not evidence, but simply that a doctor's testimony based upon a premise which was untrue as a matter of common knowledge, was not substantial evidence. No such situation here exists.'' (P. 697.)

The same reasoning applies to distinguish the *Safeway Stores* case from the instant one. Here, as in *Sanguinetti,* the cause of plaintiff's condition was established by expert testimony.

Of the many authorities in other jurisdictions (see cases collected in 79 A.L.R.2d 301), defendants rely on two cases involving erroneously filled prescriptions, *Fagan* v. *McRae* (1918) 169 N.Y.S. 577, and *Scherer* v. *Schlaberg* (1909) 18 N.D. 421 [122 N.W. 1000, 24 L.R.A. N.S. 520]. Admittedly, there are no California cases.[4]

In *Fagan* v. *McRae, supra,* the druggist filled the plaintiff's prescription with an opaque white liquid instead of the clear brown one prescribed. There was evidence that during the two days the plaintiff ingested the erroneous prescription before the mistake was discovered, her condition became worse. In reversing the judgment in favor of the plaintiff, the court said that since the physician who testified about the decline in the plaintiff's condition was not acquainted with the ingredients of the medicine erroneously furnished, there was insufficient evidence of proximate cause.

In *Scherer* v. *Schlaberg, supra,* a 3-month-old infant suffering from uremic poisoning was given several doses of an erroneously filled prescription and died. In affirming the judgment in favor of the druggist on the basis of the contributory negligence of the child's father, the court pointed out that the expert testimony unanimously established that the child died of uremic poisoning. There was no expert testi-

[4]*Gottsdanker* v. *Cutter Laboratories* (1960) 182 Cal.App.2d 602 [6 Cal. Rptr. 320, 79 A.L.R.2d 290], dealt with a vaccine supplied by the defendant which caused poliomyelitis. It was assumed throughout the decision that the evidence established the vaccine as the proximate cause of the disease, so the case is of no significance upon the question involved here.

mony that the child's death was caused by the morphine in the erroneously filled prescription.

Other cases cited by defendants are not in point here as in all of them only a single theory was put forth as to the proximate cause of the injury complained of. When it appeared that some of the testimony offered by the respondent was inconsistent with the theory, recovery was denied. In the instant case there was extensive and conflicting expert testimony concerning various theories as to the nature and cause of plaintiff's vasculitis. All of the experts agreed that the causes of vasculitis were unknown and that a variety of drugs including cortisone were suspected. They differed only in their interpretation of the diagnostic facts presented as to the particular type of vasculitis incurred by plaintiff and its cause. Plaintiff's expert, Dr. Tufft, testified that she was suffering from one rare type of vasculitis known as allergic or hypersensitivity vasculitis.

Two of defendants' experts, Dr. Pruett and Dr. Lewis, agreed with Dr. Tufft as to the existence of many different types of vasculitis. Dr. Pruett agreed with Dr. Tufft that plaintiff had been suffering from a self-limiting type of disease. Dr. Pruett, however, thought that plaintiff's case was the rare type of vasculitis related to the malignant phase of her arthritis. Dr. Tufft did not think that plaintiff's arthritis had progressed to the malignant stage. Dr. Lewis also confirmed Dr. Tufft's theory concerning different types of vasculitis but disagreed with Dr. Tufft as to the particular type of vasculitis that plaintiff had contracted. While Dr. Tufft concluded that plaintiff had suffered from a hypersensitivity or allergic vasculitis, Dr. Lewis concluded that she had the even rarer form of necrotizing neuthropy vasculitis. The experts also agreed that her condition was a complex and rare one and that there was not a great deal of medical knowledge or experience about vasculitis. Under these circumstances, the jury could believe the testimony of plaintiff's expert and base their finding on his conclusion that her condition was caused by allergic or hypersensitivity vasculitis brought about by the erroneously refilled prescription.

While we have found no cases equal in medical complexity to the instant one which have been decided by an appellate court, in this or any other state, a few are helpful. In *Cody* v. *Toller Drug Co.* (1942) 232 Iowa 475 [5 N.W.2d 824], there was a similar conflict of expert testimony. The plaintiff al-

leged that the medicine furnished by the defendant druggist contained atropine, a poisonous substance not called for in the prescription. The evidence showed that after the plaintiff took the medicine, the pupils of his eyes dilated and ultimately he was unable to see properly and had other symptoms, identified by several physicians as those of atropine poisoning. The plaintiff's expert testified that he had made a chemical analysis of the medicine and discovered atropine therein; the defendant's expert testified to the contrary and stated that it was impossible to make a chemical analysis of the medicine that would be absolutely trustworthy. There was also conflicting testimony indicating that one of the other ingredients in the medicine prescribed caused the dilation of the plaintiff's pupils. The court, in affirming a judgment for the plaintiff, held that there was sufficient evidence that the medicine contained atropine and commented that it was not necessary for the plaintiff to prove conclusively the presence of atropine, or to exclude to a certainty every other suggested poison, it being sufficient that plaintiff's theory of atropine poisoning was reasonably probable and more probable than any other theory based upon the evidence.

(Cf. *Abbott Laboratories* v. *Lapp* (7th Cir. 1935) 78 F.2d 170, an action against the manufacturer of Lactigen, a sterilized skimmed milk product used in serum. The plaintiff received a hypodermic injection of the product from his physician in the course of treatment for a kidney infection and suffered a severe arm infection. The plaintiff's experts testified that the infection was caused by the streptococci and staphylococci bacteria present in the serum. The defendant's experts indicated that the infection could have come from other sources, namely, from bacteria on the plaintiff's arm or the infection already present in the plaintiff's body for which he received the treatments. The court held there was sufficient evidence of proximate cause.)

*Boeck* v. *Katz Drug Co.* (1942) 155 Kan. 656 [127 P.2d 506], involved an eyedrop prescription erroneously filled with atropine instead of the eserine prescribed. It is somewhat similar to the instant case in that the plaintiff was already suffering from an eye disease at the time of the prescription. The plaintiff's doctor testified that while the eye condition could not have been caused by the use of atropine, there was also substantial evidence that the use of the erroneous prescription caused the disease to develop much more rapidly than it would have otherwise. The court held that

there was sufficient evidence of causation and affirmed the judgment for the plaintiff.

In the instant case, there was likewise testimony (from Dr. Pruett, defendants' witness) that plaintiff's arthritic condition was severely aggravated by her subsequently incurred vasculitis.

The purported appeals from the orders denying motion for nonsuit and motion for new trial are dismissed.

The order denying motion for judgment notwithstanding the verdict is affirmed.

The judgment is affirmed.

Agee, Acting P. J., and Taylor, J., concurred.